In re Petition of the BOARD OF DI-
RECTORS OF HOPEWELL INTER-
NATIONAL INSURANCE LTD., as
Scheme Administrators of Hopewell
International Insurance Ltd., Debtor
in Foreign Proceedings.

Bankruptcy No. 98 B 45440(TLB).

United States Bankruptcy Court,
S.D. New York.

Aug. 19, 1999.

Chadbourne & Parke L.L.P., New York City, by Howard Seife, Peter R. Chaffetz, Steven C. Schwartz, Johnathan F. Bank, for the Board of Directors of Hopewell International Insurance Ltd.

Cozen and O'Connor, Philadelphia, Pennsylvania, by Stephen A. Cozen, Richard M. Mackowsky, Neal D. Colton, David M. Doret, for Gold Medal Insurance Company.

Howard Smith & Levin L.L.P., New York City, by David W. Haller, Adam B. Siegel, for General Mills, Inc.

Seward & Kissel, New York City, by Ronald L. Cohen, Mark D. Kotwick, Charles M. Miller, for General Mills, Inc.

Zelle Larson & Hoffmann L.L.P., Minneapolis, Minnesota, by Lawrence Zelle, Richard L. Voebel, Lawrence T. Hoffmann, for General Mills, Inc.

## OPINION ON MOTION FOR INJUNCTIVE RELIEF PURSUANT TO 11 U.S.C. § 304

TINA L. BROZMAN, Chief Judge.

Having voted in favor of and failed to object to a Bermuda court's sanctioning of a reinsurance company's scheme of arrangement, the "captive"[1] insurer of General Mills, Inc. ("General Mills"), joined by its insured, now asks this court to deny under § 304 of the Bankruptcy Code injunctive relief[2] in aid of that scheme primarily on the theory that it impermissibly requires arbitration of disputed claims in Bermuda, under Bermuda law—pursuant to the International Conciliation and Arbitration Act of 1993 which adopted the model law promulgated by the United Nations Commission on International Trade Law ("UNCITRAL")—rather than under the law and in the place called for by the captive's reinsurance contract, Minnesota. In addition, the captive asks that I refuse to extend an injunction which the Bermuda court entered preventing the captive from enforcing against the reinsurer or its property any liability of the captive to its insured once that claim is determined or settled. That injunction was entered because the captive had candidly disclosed its intention to proceed with litigation against the reinsurer in the United States, despite the ban on such litigation contained in the scheme. The captive says it is entitled to ignore the scheme because of a variety of defects with which it is plagued. To dodge the consequences of its obvious default to point out to the Bermuda court just what it now claims was wrong with the scheme, or to appeal from the order of sanction, the captive suggests that a board of directors appointed as scheme administrators cannot be a foreign representative under § 304 and that a scheme, once sanctioned, cannot be granted comity because the court file is closed. I feel constrained to ask why, if a board of directors can be a chapter 11

1. A captive insurance company is one owned by and run for the benefit of an operating company. The captive typically has few assets or employees and reinsures its risk with a reinsurer.

2. Whereas the motion was styled as one for preliminary injunctive relief, I permitted General Mills to intervene and the parties to conduct discovery and I thereafter held a plenary trial on the merits of the § 304 petition. (All creditors were on notice of the requested nationwide injunction; none save Gold Medal appeared.) Even prior to the trial, the scheme administrators had asked that I consider their request one for permanent injunctive relief. They reiterated that request, to which the respondents have never objected, during closing arguments. Accordingly, the respondents having been on notice of the request and having had a full and fair opportunity to litigate the merits of the relief sought in the § 304 petition, I am acceding to the scheme administrators' request. *See* Coquillette, MOORE'S FEDERAL PRACTICE 3D, ¶ 65.21[5], 65–35 to 65–38 (3d ed.1999).

debtor in possession whom we expect to be recognized as such abroad, can't a board of directors be scheme administrators recognized as such here? As to the second argument, the short answer is that it makes little sense to grant comity to proceedings where a scheme has not yet been sanctioned but to refuse to grant comity in furtherance of a scheme having received judicial scrutiny and approval, simply because the case technically has been closed even though the scheme's ends have yet to be accomplished.

## I.

*A. Background*

### 1. The Parties

Hopewell International Insurance Ltd. ("Hopewell") is a Bermuda reinsurance company that reinsured captive insurers ("captive-cedents" or "reinsureds") owned by major industrial companies here and overseas. Transcript of Trial Testimony of Kieran Kerr, dated October 13, 1998, at page 880, to be referred to as "Kerr at ___." [3] Among Hopewell's captive-cedents is Gold Medal Insurance Company ("Gold Medal"), the captive insurer of General Mills. It is Gold Medal and General Mills who challenge the propriety of (i) the nationwide injunctive relief which Hopewell seeks from this court, specifically, an injunction preventing Gold Medal and all other scheme creditors from commencing any arbitration or judicial proceedings or enforcing any arbitral award or judgment against Hopewell or its property and (ii) this court's granting comity to and thus extending an injunction issued by the Bermuda court preventing Gold Medal from commencing any action or proceeding, enforcing any arbitral award or judgment against Hopewell or attaching any of its assets located in the United States.

### 2. How Hopewell Operated

Hopewell did not retain all of its own risk but reinsured or "retroceded" approximately 95% of that risk with entities known as "retrocessionaires" who participated in Hopewell's yearly Basic Treaty and other retrocessional facilities that supported the Basic Treaty (all together the "Retrocession Treaties"). Kerr at 882–85. To accomplish this, Hopewell entered into yearly contracts with the retrocessionaires obligating them to pay to Hopewell specified percentages of losses which Hopewell was called upon to pay its reinsureds. Hopewell's retrocessionaires included well-known professional reinsurers such as "Swiss Re," "SCOR," "Zurich" and "Hanover" as well as certain of its own captive-cedents. Transcript of Trial Testimony of Graham Denys Brice, dated November 3, 1998, and November 11, 1998, at page 1196, to be referred to as "Brice at ___." [4] In a sense, Hopewell's captive-cedents looked to the creditworthiness of the retrocessionaires inasmuch as they had assumed the lion's share of Hopewell's risk. If, however, a retrocessionaire were to become insolvent or otherwise fail to pay, Hopewell alone was responsible for the shortfall to its reinsureds. Kerr at 886. So Hopewell bore the risk not only of its 5% retention but of the failure of a retrocessionaire to honor its obligations. Brice at 1202–03.

Until 1995, when it entered "run-off," that is, the cessation of assuming new risk and the winding-down of its existing business, Hopewell acted primarily as a property reinsurer. Kerr at 881. However, for a period in the 1970s it also accepted casualty risks, including losses from pollution. Kerr at 881. Indeed, it was the casualty risks which, in the 1990s, became a growing concern for Hopewell's board of directors and ultimately contributed in

---

**3.** Kieran Kerr is the General Manager of International Risk Management Group Services Center, in charge of claims management for Hopewell. Kerr at 874, 876.

**4.** Graham Denys Brice was the International Risk Management Group manager responsible for Hopewell from approximately March, 1991, until July, 1996. Brice at 1193–94.

large part to the decision to put Hopewell into run-off.

Among Hopewell's captive-cedents were its shareholders, each of which had a seat on Hopewell's board of directors. Kerr at 880. The company had no employees but contracted with International Risk Management Group ("IRMG"), a subsidiary of Swiss Re, for the provision of management services. Kerr at 877–78, 937.

Hopewell was not alone in having no employees. Most of its reinsureds had no claims departments either and contracted with IRMG, through IRMG's affiliate known as Global Claims Services, to provide claims handling services. Kerr at 888–89. Since IRMG was on both sides of submitted claims, managing Hopewell, the reinsurer, on the one hand, and providing claims handling services to Hopewell's reinsureds, on the other, typically, Global Claims Services would appoint an independent loss adjuster to make reserving and payment recommendations to the captive-cedent. Brice at 1248–49. Hopewell relied on these recommendations to set case reserves and approve claims for payment although Hopewell, on its own, set reserves for legal fees on disputed claims. Kerr at 891, 893–94; Brice at 1252, 1256–57.

3. The "Pesticide Incident"

In June, 1994, General Mills first disclosed to Hopewell that a contractor had applied an unapproved pesticide to a substantial quantity of oats. That same year, General Mills retained an attorney by the name of Lawrence Zelle of Zelle & Larson to attempt to establish coverage for the loss, General Mills' largest property loss ever, under General Mills' insurance policies, including policies Gold Medal reinsured through Hopewell.

Through Global Claims Services, Gold Medal appointed the Thomas Howell Group, U.S.A. to be the independent claims adjuster for the loss. It also retained the law firm of Cozen and O'Connor to analyze the coverage issues. Because all the directors of Gold Medal were either officers or directors of General Mills, IRMG requested that both companies appoint an "independent loss representative" to assume decision-making authority for Gold Medal with respect to this loss. Brice at 1249; Transcript of Trial Testimony of John Weddle, dated November 11, 1998, at page 1550, to be referred to as "Weddle at ___." [5] The following July (in 1995), Mr. Lee Troske was retained in that capacity. Based on his opinion, Gold Medal denied coverage. Litigation between General Mills and its captive eventually ensued.

From July 1994 to May 1995, Global Claims Services reported periodically to Hopewell regarding General Mills' progress toward presenting a claim to Gold Medal. Brice at 1246–47. By mid-May 1995, Hopewell was aware that General Mills had submitted a formal claim in the amount of $219 million to Gold Medal and that a proof of loss with respect to the loss of oat grain alone had been submitted to Gold Medal in the amount of $29 million. *See* Gold Medal Exhibit 3, Affidavit of Jerry R. Simmons, ¶¶ 8–12; Brice at 1288, 1303. However, at the instruction of Cozen and O'Connor, which did not want any evaluation of General Mills' loss to be discoverable in the litigation which was contemplated, Gold Medal did not file a claim with Hopewell based on the Pesticide Incident nor did the independent loss adjuster submit a reserve recommendation to Hopewell. Brice at 1302. Rather, the independent adjuster transmitted General Mills' proof of loss "without comment." As a result, Hopewell did not establish a case reserve on account of the Pesticide Incident. Brice at 1252, 1256, 1283, 1286–87, 1320; Kerr at 1077.

5. John Weddle is the Director of Risk Management at General Mills and has been Presi-
dent of Gold Medal since 1995.

#### 4. Hopewell's Assets

Hopewell has primarily two types of assets: (i) its accounts receivable and contingent rights to future loss payments from the retrocessionaires and (ii) cash on hand held in bank accounts which Gold Medal and General Mills contend are trust accounts.[6] Gold Medal and General Mills argue that Hopewell must deposit the proceeds of the accounts receivable and of the future loss payments into trust in Bermuda, as a result of which, they say, there are no Hopewell assets in the United States. Hopewell, on the other hand, urges that there are no trust accounts and that, even if there were, the payments from the retrocessionaires are not subject to the trust provisions. Hopewell emphasizes that the retrocessionaires located in this district owe the greatest percentage under the Retrocession Treaties for the years relevant to the Pesticide Incident. As of September, 1998, approximately two-thirds of Hopewell's accounts receivable from U.S. retrocessionaires were from those located in this district. Kerr at 910, 914–18.

#### 5. The Decision to Go Into Run–Off

A number of factors featured prominently in Hopewell's decision to go into run-off. The first of these, at least in time, was a $500 million petro-chemical explosion loss in 1987. That caused renewals of Hopewell's reinsurance program to become increasingly difficult. Brice at 1208. Graham Brice testified that he encountered widespread sales resistance among potential retrocessionaires in 1993, with one prospective reinsurer quipping that Hopewell was "marketing a dinosaur." Brice at 1213. Hopewell's small capitalization, coupled with its requirement that retrocessionaires participate in the risks of all of Hopewell's captive-cedents, was unattractive to reinsurers, who preferred to underwrite the participating clients individually. Brice at 1215–16. Hopewell found itself in

a "Catch–22." Retrocessionaires did not want to participate with unlimited liability through a company with such a small retained risk (4.9%). Brice at 1215–16, 1219. But without more capital, which was unavailable, Hopewell could not increase its retention to make up for the shortfall in reinsurance or to induce reluctant retrocessionaires to participate.

Thus, in the spring of 1994 before it knew anything about the Pesticide Incident, Hopewell was preparing for the possibility that the Retrocession Treaties might not renew and that Hopewell would go into run-off as of June 30th of that year. As it transpired, the retrocessionaires agreed to renew their reinsurance for the 1994–95 policy year, but Swiss Re conditioned its participation in the Retrocession Treaties upon express representations that Hopewell was investigating methods of recapitalization. ·Brice at 1225. The Pesticide Incident was not known during the renewal negotiations and accordingly had no effect on this decision. Brice at 1246.

Hopewell explored a number of alternatives, including raising substantial new capital; selling Hopewell; and selling the Hopewell book of business to a better-capitalized third party with a Hopewell run-off to follow. Brice 1226–27. As Brice testified, the first two of these options proved unfeasible in the first instance because of the unknown magnitude of Hopewell's pollution exposure. Brice at 1228. Added to this as the board of directors progressed in its consideration was the potential liability to Gold Medal, which further impeded the prospects for attracting new capital into the existing company. Brice at 1233, 1264. Between November 1994 and March 1995, on the recommendation of IRMG, Hopewell decided to go into a solvent runoff and transfer its book of business to a new reinsurance company which would be owned in large part by

---

**6.** The accounts receivable are plainly not held in trust. It is these assets upon which Gold Medal would like to execute if it settles its dispute with General Mills and converts that award to a judgment in a U.S. court.

Swiss Re.[7] Brice at 1238, 1241. This decision was made at a time when Hopewell's board of directors was ignorant of the possibility that Hopewell could adopt a scheme of arrangement. Brice at 1241.

### B. The Scheme of Arrangement

There are two broad types of schemes of arrangement in Bermuda: "cut-off" schemes and "run-off" or reserving schemes. Transcript of Trial Testimony of Jan W. Woloniecki, dated September 17, 1998, at page 102, to be referred to as "Woloniecki at ___." The latter variety, sometimes called a "long-tail" run-off scheme, is one where the liabilities will not be fully quantified and satisfied for a long period of time due to the nature of the reinsurer's book of business; it can last for up to twenty years. Woloniecki at 102–03; Moss at 386. To limit the length of such run-offs, it has become common practice in Bermuda for reinsurers to propose "cut-off" schemes of arrangement which set limitations on the period during which claims may be filed, analogous to what we refer to colloquially in U.S. practice as a "bar date." Woloniecki at 102, 115–16. Although cut-off schemes had been used in Bermuda in conjunction with insolvent run-offs, Hopewell's use of this procedure was a first in a solvent run-off.

### 1. Why a Cut–Off Scheme?

The idea emanated from Jan Woloniecki, Q.C., an English barrister residing and practicing in Bermuda. Woloniecki is an expert in reinsurance law and insolvency. Woloniecki at 96. He first proposed to Brice the adoption of a scheme in early March, 1995. Woloniecki at 100; Brice at 1244. Woloniecki conceived of a cut-off scheme which would last no more than five years and contain a claims deadline or bar date, an estimation procedure and a mechanism for allowing creditor claims to be paid during the five-year run-off period. Woloniecki at 102. There were at least two distinct advantages to this procedure. First, because of the potential long-tail pollution losses, it was estimated that a traditional run-off of Hopewell could take twenty years to complete whereas a cut-off scheme could very significantly reduce that period (by estimating those claims over the five-year period), at great savings of administrative costs. Woloniecki at 103, 116; Brice at 1245. Moreover, the shorter run-off period would minimize the risk caused by insolvent retrocessionaires. This was no small consideration, for a number of retrocessionaires had already stopped performing and Lloyd's of London, which insured a significant percentage of Hopewell's pollution exposure, was in crisis. No one knew how long Lloyd's would continue to pay claims. Brice at 1245. Obviously, a Lloyd's insolvency could have caused a Hopewell insolvency, to the detriment of its creditors. Woloniecki at 117. Hopewell's board of directors approved the drafting of a scheme of arrangement in late March, 1995. Woloniecki at 118.

### 2. General Provisions of the Scheme

The scheme, as ultimately sanctioned by the Bermuda court, provided that all claims, whether liquidated or not, had to be filed no later than June 30, 1999. Woloniecki at 124. The aim or purpose of the scheme, by way of its estimation and dispute resolution procedures for unliquidated claims, was to finally determine all of Hopewell's liabilities so that all claims could be paid by June 30, 2001. Woloniecki at 124–25.

---

7. As Gabriel Moss, Q.C., Hopewell's expert on Bermuda, English and international insolvency and reinsurance insolvency law, testified, there are three types of run-off: insolvent run-offs, where the company is insolvent; solvent run-offs, where the company reasonably expects but is not dead certain that it will be solvent at the end of the run-off; and solvent run-offs where the company knows that it will be solvent at the end of the run-off. Transcript of Trial Testimony of Gabriel Moss, dated October 2, 1998, at pages 385–86, 391 to be referred to as "Moss at___." Moss at 385–86, 391. Hopewell's run-off was of the second variety.

The timetable accompanying the scheme package documents sent to creditors indicated the time, date and place of the class meetings as well as the time, date and place of the sanction hearing. Objections to the scheme had to be lodged at the sanction hearing at the latest. Transcript of Trial Testimony of Ian Kawaley, dated October 7, 1998, at page 620–21, to be referred to as "Kawaley at ___." [8]; Moss at 408, 431.

On or before June 30, 2001, Hopewell is to convene a final meeting of creditors. *See* Scheme of arrangement at §§ 5.1.1, 5.1.2, to be referred to as "scheme at § ___." At some time after the final meeting (*see* scheme at § 5.2.3), a final distribution will occur. After all scheme creditors are paid in full, including interest, any surplus is to be distributed to scheme members (equity) on a *pari passu* basis. *See* scheme at § 5.2.1. The scheme terminates either after the final meeting and the final distribution occur (*see* scheme at § 5.3.1(a)), or by resolution passed by the scheme creditors. *See* scheme at § 5.3.1(b). If the scheme terminates under the first alternative, Hopewell must convene a general meeting to determine whether Hopewell should be wound-up voluntarily and dissolved or sold. *See* scheme at § 5.4.1.

### 3. Classification of Claims

As originally drafted, the scheme envisioned one class of creditors whose claims

would be paid as they became "agreed," that is, undisputed as to *quantum* (Woloniecki at 277) between Hopewell and its reinsured. Hopewell would pay the creditor the agreed sum less Hopewell's net retention [9] and any amounts it was unable to collect from retrocessionaires on account of the claim. At the end of the five-year run-off period, given sufficient assets, Hopewell would settle the unpaid portions of these claims in full. Woloniecki at 104–08. Under this originally-proposed scenario, the agreed claims would not have been fully satisfied for a minimum of 5½ years.[10] Minnetonka, a captive-cedent with an agreed claim of approximately $50 million—which was large enough to constitute a blocking position on any contemplated vote in favor of a scheme—balked at this prospect. The balance of Minnetonka's claim was near to adjustment by March, 1995. Absent the proposed scheme, Minnetonka expected that Hopewell would go into solvent run-off, paying Minnetonka in full the agreed $50 million portion of its claim. Not surprisingly, Minnetonka thus refused to allow Hopewell to postpone payment of its net retention and insisted that any scheme provide interest on the deferred portion of all claim payments.

### a. Provisions of the Scheme

Woloniecki devised a workable solution which would allow for attainment of the

**8.** Kawaley was qualified as an expert in Bermuda insolvency law.

**9.** To illustrate how Hopewell operated we will use Gold Medal as an example. Gold Medal insured General Mills for all but a small retained risk. Gold Medal's risk was insured in full by Hopewell. Hopewell's risk was insured except for 5% by the retrocessionaires. The 5% held by Hopewell is known as a "net retention." Practically speaking, when a captive-cedent submitted a claim to Hopewell, it called upon the retrocessionaires to pay Hopewell which, in turn, paid to the captive-cedent whatever Hopewell received from the retrocessionaires, Hopewell's net retention,

plus any amounts not paid by a defaulting retrocessionaire.

In the run-off scenario, however, Hopewell would not pay its net retention or whatever it could not collect from the retrocessionaires until the end of the run-off period to ensure that it had sufficient assets to go around, failing which it would make a *pro rata* distribution of the outstanding amounts due. Woloniecki at 105–06.

**10.** The four years' delay would be to allow for the filing of claims; the additional year and one-half would be the estimated period to liquidate, through arbitration, the disputed claims.

benefits of a scheme while mollifying Minnetonka; he redrafted the proposed scheme to create two classes for voting purposes. Woloniecki at 142, 144. Creditors whose claims were agreed as of June 1, 1995, constituted Class A, while Class B creditors were defined as all other creditors, *i.e.* creditors whose claims were unliquidated or not agreed as of June 1, 1995. Woloniecki at 125–26, 140; *see* scheme at §§ 1.1.1, 2.6.1. As a result of these definitions, a creditor could not vote both in Class A and Class B, but the scheme provided Class A creditors with the opportunity to have any unliquidated claims included in the valuation of their Class A claim for voting purposes. Woloniecki at 146; *see* scheme at § 4.5.1.

Class A claims, so far as agreed, were to be paid everything which Hopewell collected from retrocessionaires on account of those claims plus Hopewell's net retention (and anything it couldn't collect from retrocessionaires), as soon as practicable but in any event no later than June 30, 1999. Woloniecki at 125, 140, 275–78; *see* scheme at § 2.6.1. Once Class B claims (or the unliquidated portion of Class A claims) were liquidated, either by agreement, estimation or dispute resolution, Hopewell would pay that which it could collect from the retrocessionaires with the remaining balance (including the net retention at a minimum) to be paid only at the end of the scheme period (June 30, 2001), with interest.[11] Woloniecki at 125–26, 140, 275–78; *see* scheme at §§ 3.2, 3.3.

If Hopewell were to become insolvent while it was making Class A payments, those payments would cease and Class A claims would be treated in the same way as Class B claims. Woloniecki at 126; *see* scheme at 2.6.1(b). There was thus a chance that if Hopewell were to become insolvent after the Class A claims had been paid (the more likely possibility than an insolvency during the period of payment to the Class A creditors), the Class B

claimants (and those Class A claimants with unliquidated components to their claims) would receive less than the 100% to be received by Class A creditors. Cognizant of the potential differences in treatment, Woloniecki put the creditors without agreed claims into the same class so that they could vote on whether or not to approve the scheme. Woloniecki at 142–44. At the time that he drafted the scheme, Woloniecki did not know that Gold Medal was a class A creditor; he learned that during the course of the § 304 proceedings. Woloniecki at 142–22.

### b. The Explanatory Statement

A scheme of arrangement must be accompanied in Bermuda by an "explanatory statement," a document which greatly resembles a disclosure statement accompanying a plan of reorganization in a chapter 11 case. Woloniecki at 123; Kawaley at 618. Hopewell's explanatory statement, drafted by Woloniecki and Kawaley and ultimately approved by the Bermuda court, outlined this two-class structure of the scheme as well as the possibility of insolvency and the variance, in the face of an insolvency, from the strict *pari passu* distribution which would occur in a liquidation proceeding. *See* Explanatory statement, Letter from the President and § 3.2, to be referred to as "expl. stmt. § __." The explanatory statement informed scheme creditors that Class A creditors, those with pre-scheme commutations and settlements, had clearly differing rights from those of Class B creditors, whose claims were not liquidated or agreed as of June 1, 1995, as a result of which they were being put into separate classes for voting purposes and were invited to attend different statutory meetings. Woloniecki at 144; *see* expl. stmt. Letter from President and § 3.2. They were also told that absent an affirmative vote of the requisite majorities of each class,[12] the scheme could

---

11. This is known as the deferred payment mechanism under the scheme.

12. Seventy-five percent in value of those creditors voting in each class had to vote in favor

not be sanctioned. Woloniecki at 144; *see* expl. stmt. § 4.1.

The explanatory statement delineated the scheme claims procedure, clearly stating that holders of liquidated or unliquidated claims subject to the deferred payment mechanism of the scheme (that is, claims without pre-scheme commutations or agreements) were required to file a Notice of Claim no later than the Final Filing Deadline of June 30, 1999. *See* expl. stmt. §§ 3.3–3.5. It also apprised creditors that the valuations of claims contained in the voting proxies were for voting purposes only; that they were not binding on either the scheme creditor or Hopewell for purposes of that claim's determination under the scheme; and that a creditor had the right to object to the assigned valuation by returning the proxy with the appropriate documentation supporting the different valuation. Woloniecki at 146.; *see* expl. stmt. § 4.3.

### 4. The Scheme's Dispute Resolution Procedures

#### a. *Arbitration in and under Bermuda Law*

The provisions of the scheme respecting the resolution of the unliquidated claims (including the "Pesticide Claim"[13]) are those which gall Gold Medal and General Mills because their rights to arbitrate in and under the law of Minnesota law have been displaced. The scheme provided for arbitration as the exclusive means of resolving disputed claims. *See* scheme at § 2.5.1. Any arbitration was to take place in Bermuda in accordance with the procedural and substantive laws of Bermuda. Woloniecki at 134–35; *see* scheme at § 2.5.8. As Woloniecki explained, Hopewell had two basic forms of agreement with its reinsureds, those which provided for arbitration without specifying any venue and those which provided for arbitration at the

home office of the captive-cedent, that is, the company which reinsured its risk through Hopewell. Woloniecki at 128. There were thus many different venues in which arbitration might have been required, potentially simultaneously. Woloniecki at 129. Woloniecki decided to preserve arbitration as the means of claims resolution or estimation rather than replacing contractual arbitration with suit in Bermuda's courts, as was done in the *Mentor* scheme of arrangement, because he realized that the captive-cedents might be displeased with the loss of arbitration. Woloniecki at 127–28. His aim in departing from some of the contractual arbitration provisions by choosing one applicable law and one forum was to achieve uniformity in result and efficiency in the processing of unliquidated or disputed claims instead of subjecting Hopewell to simultaneous proceedings in multiple jurisdictions under different laws with the attendant risk of inconsistency and great cost. Woloniecki at 127, 129, 134–35. At the time the scheme was drafted he was aware of no dispute in which the application of Bermuda law would change the outcome. Woloniecki at 135–36. Hopewell's board of directors approved the final scheme documentation on May 22, 1995. Woloniecki at 122.

#### b. *The Scheme and Explanatory Statement are Clear and Not Misleading*

Although the explanatory statement does not state explicitly that any arbitration is to be governed by Bermuda law, the scheme itself does at § 2.5.8 and the explanatory statement makes clear that any arbitration is to occur in Bermuda under the International Conciliation and Arbitration Act of 1993, "notwithstanding any contrary provisions in any contract of reinsurance." Expl. stmt. at § 3.6. The language of the scheme itself is so plain as to be

---

of the scheme. Woloniecki at 143, 147; *see* scheme § 4.4.1.

**13.** I use "Pesticide Claim" as a shorthand reference to the liability that Gold Medal says Hopewell has to it arising out of the Pesticide Incident.

understandable by an unsophisticate, let alone those steeped in this industry:

> Unless the parties otherwise agree, the place of arbitration shall be Bermuda and the arbitration shall be governed by the substantive and procedural law of Bermuda . . .

Scheme at § 2.5.8.

Gold Medal contends that the explanatory statement was misleading in not underscoring that Gold Medal would forfeit its right to arbitrate in and under the law of Minnesota were the scheme to be sanctioned. However, the explanatory statement did say the arbitration would be in Bermuda and under Bermuda's International Conciliation and Arbitration Act of 1993, which should have led Gold Medal to further inquiry; the scheme itself was explicit and easy to understand; and Weddle, Gold Medal's President, only flipped through the explanatory statement and scheme, sending them along to General Mills' in-house counsel (Weddle at 1558, 1603–04, 1607–08, 1617, 1680), as a result of which Gold Medal only has itself to blame if it did not learn of the scheme's provisions.

### C. Presentation of the Scheme and its Sanctioning

Ian Kawaley is a barrister and attorney admitted in England, Wales and Bermuda and an associate of Woloniecki's. He was primarily responsible for commencing and overseeing the judicial process of getting the scheme sanctioned by the Bermuda court. Kawaley at 610.

#### 1. First *Ex Parte* Summons for Approval to Convene Meetings of Creditors

Step one in this process was the filing of an *ex parte* originating summons on May 23, 1995, the purposes of which were to (i) seek leave of the court, as required by § 99 of Bermuda's Companies Act 1981, to convene the meetings of creditors to vote; (ii) obtain guidance from the court as to the manner of conducting those meetings;

and (iii) receive court approval of the notice and proxy forms and the valuation of the creditors' claims contained in the proxies. Kawaley at 631–34. Annexed to the summons as exhibits were draft notices to creditors, draft proxy forms, an affidavit by Graham Brice, and drafts of the explanatory statement and scheme of arrangement. Return on the summons was held in chambers on May 25, 1995, at which time Kawaley outlined to the presiding judge the salient provisions of the scheme, including some unusual aspects, among them that Hopewell was setting a value for creditors' claims for voting purposes and the differences between the treatment of class A and class B creditors. Kawaley at 643–44. After the conclusion of Kawaley's presentation, the judge signed an order approving the notices, proxy forms, claims' valuations and procedures for voting (the "May 23, 1995, Order"). The order specifically set forth that the valuation of claims for voting purposes was subject to creditors objecting either at the meeting or the sanction hearing. Kawaley at 644–45.

Phase two involved completing and mailing out the scheme package to scheme creditors (including the May 23, 1995, Order). For the most part, this was accomplished prior to May 25, 1995, followed on June 9, 1995, by the mailing of general and special proxy forms containing updated and finalized valuations of creditors' claims. Kawaley at 645–46. The proxies served a twofold goal of enabling a scheme creditor to vote at its meeting without actually attending in person and to either agree with or dispute the value that Hopewell had given to the creditor's claim for voting purposes. Kawaley at 647; Brice at 1271.

#### 2. Valuation of Gold Medal's Claim

Upon receiving the proxy materials, Gold Medal recognized immediately that it had been given a Class A claim of only $25,000 for voting purposes. Weddle at 1562–64. Weddle, as Gold Medal's Presi-

dent, called John Walsh, the claims manager for Hopewell employed by International Risk Management Bermuda (Brice at 1268, 1283), and inquired why the Pesticide Incident was not reflected in the valuation of Gold Medal's claim. Weddle at 1566. Walsh responded that no value was attributed for voting purposes because no proof of loss had been filed and, therefore, no reserve had been established. Weddle at 1566. He assured Weddle, however, that the voting valuation would not affect the normal claims handling process employed by Hopewell. Weddle at 1567. Weddle acquiesced in the $25,000 valuation during the telephone conversation and again by signing and returning to Hopewell the general proxy form. Weddle at 1567, 1570, 1613–16; *see* Hopewell Exhibit 120; Gold Medal Exhibit 36.

3. Meetings of Creditors and Members: Gold Medal Votes in Favor

Approximately two weeks after the finalized valuations and proxy forms were mailed, the members'[14] and creditors' meetings were convened. Kawaley, Brice and Woloniecki were present at all three. Kawaley at 653; Brice at 1272; Woloniecki at 149. All members present (18) voted in favor of the scheme, as did the Class B creditors. Kawaley at 657.

The only other meeting was that of the class A creditors. Out of the $96 million in eligible Class A claims, $88 million worth were voted by special proxy in favor of the scheme. Kawaley at 655–56, 662–63; *see* Hopewell Exhibit 74, tab 3, to be referred to as "Exh. 74, tab 3." Four general proxies totaling $1.8 million were represented at the meeting by John Walsh (holding two general proxies), Martin Smith (holding one) and Arthur Deters, holding the $25,000 general proxy on behalf of Gold Medal. Kawaley at 650, 657; *see* exh. 74, tab 3, Ernst & Young Report (Bates # 000197), to be referred to as the "E & Y Report." The remaining $6.2 million in claims were not voted. Gold Medal accepted the $25,-

000 valuation of its class A claim by striking the word "reject" on its general proxy. Kawaley at 650; Weddle at 1570.

What actually occurred at the meeting is the subject of some dispute. Gold Medal contends that Deters was asked by Weddle to attend the Class A creditors' meeting, observe and abstain from voting. Transcript of Trial Testimony of Arthur H. Deters, dated November 12, 1998, at page 1699–1700, to be referred to as "Deters at ___." Deters took notes at the meeting and later embodied them into a memorandum which he faxed to Weddle. Deters at 1704, 1707. Deters testified that he inquired at the start of the meeting how to abstain. Deters at 1710. He was informed that he could abstain by not voting for or against the scheme. Deters at 1710, 1730; Kawaley at 661. Beyond posing the question, Deters never pursued lodging his abstention. Kawaley at 661; Deters at 1728. Although Deters marked up the paper ballot that had been provided to him at the meeting to reflect an abstention (Deters at 1739), he never handed in the ballot form (Deters at 1727; Kawaley at 661) because, so few people being in attendance, the vote was taken instead by a show of hands. Kawaley at 658; Brice at 1275–76; Woloniecki at 152–53.

Whereas Deters claims to have abstained, he did nothing to effectuate that intention either by handing in the ballot form or by making an affirmative, rather than interrogative, statement to that effect. Indeed, by the three independent accounts of Woloniecki, Brice and Kawaley, Deters actually voted in favor of the scheme. Kawaley at 657–58, 663; Brice at 1275–76; Woloniecki at 150–52. In addition, Lorraine Alexander, a representative of Ernst & Young, attended the meeting for the purpose of recording the vote and later submitted a report to the Bermuda court as an exhibit to the sanction petition. Her report, which incorporates the results of the vote in spreadsheet format, shows

14. A "member" is what we refer to as a "shareholder."

that all Class A creditors, either by special or general proxy, including Gold Medal by Deters, voted in favor of the scheme. Kawaley at 663; *see* Exh. 74, tab 3; E & Y Report.

I believe that Deters' recollection of the meeting was generally confused because his testimony that no vote was taken (Deters at 1710, 1732)—by show of hands or otherwise—is completely inconsistent with his memorandum to Weddle embodying his contemporaneous notes of how the meeting transpired and reflecting that Brice announced the results of the vote. Deters at 1734, 1736. If there was no vote taken, then it stands to reason that Brice could not have reported the results of one. Three people—Brice, Kawaley and Woloniecki—have testified that a vote by show of hands occurred; that ballots were not needed because of the small number of people in attendance; and that Deters voted in favor of the scheme. The E & Y Report further corroborates this last fact. I am additionally persuaded that Deters is mistaken in his belief that Gold Medal's $25,000 general proxy was counted amongst the $6.2 million in claims that were not voted (Deters at 1711) by the testimony of Brice, Woloniecki and Kawaley as well as the E & Y Report all of which establish that the general proxyholders present at the meeting—this would include Deters—voted unanimously in favor of the scheme. Brice at 1276; Woloniecki at 152; Kawaley at 653, 657, 663; *see* Exh. 74, tab 3; E & Y Report. I conclude that Deters voted in favor of the scheme on behalf of Gold Medal.

#### 4. Sanctioning of the Scheme

The petition seeking the sanction by the Bermuda court of the scheme of arrangement was filed on the same day as the creditors' meetings took place. Kawaley at 654. A supporting affidavit of Graham Brice was filed three days later. Kawaley at 664. It annexed the explanatory statement and scheme of arrangement, the notices of the statutory meetings of creditors, tables reflecting pre-scheme commutations (indicating a pre-scheme commutation of $25,000 dated May 31, 1995 for Gold Medal) and "Claims Agreed But Not Yet Paid At 1st June 1995", the voting reports prepared by Kawaley and Ernst & Young and the special and general proxies submitted at the creditors' meetings, including the general proxy of Gold Medal signed by John Weddle accepting the $25,000 commutation and voting in favor of the scheme. Kawaley at 655.

The hearing on the sanctioning of the scheme was held on June 29, 1995, in open court. Kawaley at 665. There were no objections interposed and the presiding judge signed an order that same day sanctioning Hopewell's scheme of arrangement (the "Sanction Order"). Kawaley at 667. The Sanction Order was filed the next day with the Registrar of Companies as required by § 99 of The Companies Act 1981, thereby giving legal effect to the scheme. Kawaley at 667–68.

#### D. Post–Scheme Events and the Request for § 304 Relief

##### 1. Pesticide Incident Litigation: "Baseball" Arbitration

After the scheme was sanctioned, coverage litigation was commenced in the federal district court in Minnesota by General Mills against Gold Medal with respect to losses arising out of the Pesticide Incident. *See* Hopewell Exhibit 75, tab 3 (correspondence between Cozen and O'Connor and Milligan Whyte & Smith), to be referred to as "Exh. 75, tab 3." Simply put, Gold Medal had denied General Mills' claim, contending that the loss was not covered under the insurance contract. *See* Exh. 75, tab 3, Letter from Cozen and O'Connor to Woloniecki, dated April 9, 1996.

The judge in Minnesota persuaded the parties to agree to a so-called "baseball" arbitration because there was room for disagreement as to the coverage issues. Under the baseball arbitration, each side will submit to the arbitrator and to its

adversary a proposed sum constituting its best settlement offer. The arbitrator will then select the proposal which he or she believes to be the fairest and most reasonable settlement value without issuing any findings of fact, conclusions of law or any other written opinion. *See* Hopewell Exhibit 75, to be referred to as "Exh. 75." It is Gold Medal's belief that Hopewell is obligated to reimburse it for any loss which it sustains by virtue of a settlement with General Mills through the mechanism of the baseball arbitration.

### 2. The Need for the Second *Ex Parte* Summons and Request for an Injunction

### a. *Hopewell Set No Case Reserves on Account of the Pesticide Incident*

Notwithstanding the agreement of General Mills and Gold Medal to submit to baseball arbitration, Hopewell has not provided for any case reserves on account of Gold Medal's claim because 1) Gold Medal did not submit a notice of claim to Hopewell and 2) Hopewell sees no reason to indemnify Gold Medal in the event of a settlement with General Mills, which Gold Medal has requested, inasmuch as Gold Medal did not believe it had any liability to General Mills in the first place. Brice at 1252, 1256, 1258, 1283, 1286–87; *see* Exh. 75, tab 3. Additionally, putting aside for one moment whether or not any such settlement would be an *ex gratia* payment (which the parties also hotly debate), Hopewell does not believe that it is obligated to reimburse Gold Medal because their reinsurance contract does not contain a "follow the settlements" or "follow the fortunes" clause as Gold Medal insists it does. *See* Exh. 75, tab 3.

Gold Medal posits that, under U.S. law, the disputed clause in its contract with Hopewell would be construed as a "follow the settlements" clause, obligating Hopewell to honor Gold Medal's settlement with General Mills without need to establish the merits of the underlying claim by General Mills. *See* Exh. 75, tab 3. Gold Medal is less sanguine about its chances of achieving a similar result under English and Bermuda law, for Hopewell has expressed the position that a recent decision in England has clarified that a clause such as that between these parties is not a "follow the settlements" clause. *See* Exh. 75, tab 3.

### b. *Gold Medal Threatens Legal Action; the Need for the Bermuda Injunction*

Unable to convince Hopewell that the reinsurance contract between them contains a "follow the settlements" clause or to persuade Hopewell to commit to reimbursing Gold Medal in the event a settlement is achieved with General Mills through the baseball arbitration, Gold Medal prepared for legal action. Gold Medal informed Hopewell that Gold Medal would start suit in Minnesota to compel Hopewell to follow any settlement Gold Medal paid out to General Mills (Woloniecki at 155–59; *see* Exh. 75, tab 3) and to attach any of Hopewell's assets located in the United States in satisfaction thereof, both actions instead and in derogation of the dispute resolution procedures embodied in the scheme of arrangement as sanctioned by the Bermuda court. Woloniecki at 155–59; *see* Exh. 75, tab 3.

Accordingly, on July 27, 1998, Hopewell moved by *ex parte* originating summons to enjoin Gold Medal from violating the scheme. Kawaley at 670–71. The summons was accompanied by an affidavit of Kieran Kerr, the General Manager of IRMG Service Centre which provides claims advisory services for IRMG. Kawaley at 670–71. That affidavit laid out in great detail the precursor events and correspondence between the parties. *See* Exh. 75. A hearing was held in chambers on July 29, 1998, after which the Bermuda court issued the requested injunction (the "Bermuda Injunction"). Kawaley at 676. The Bermuda Injunction specifically provided:

That Gold Medal Insurance Company be at liberty to apply to this court to vary or discharge this Order, or to seek directions with regard thereto or with regard to the aforesaid Scheme of Arrangement, upon giving seven days notice to the Company of its intention to do so.

Hopewell Exhibit 14. Gold Medal did not pursue this avenue or any other in Bermuda. It is this injunction which Hopewell asks me to enforce against Gold Medal in the United States.

### 3. Hopewell Files a Petition Ancillary to a Foreign Proceeding

On the heels of the issuance of the Bermuda Injunction, Hopewell filed a petition ancillary to a foreign proceeding pursuant to § 304 of Title 11 of the United States Code (the "Bankruptcy Code") in the Southern District of New York, where Hopewell claims the majority of its American assets are located. The need for § 304 relief, says Hopewell, arose not only from Gold Medal's previously expressed intention to file a declaratory action against Hopewell in Minnesota and attach any of its assets located in the United States but out of Hopewell's fear that Gold Medal's actions will inspire other scheme creditors to follow suit. Woloniecki at 158. If Gold Medal is allowed to pursue its course of action and other scheme creditors swim in its wake, instituting suit to enforce their rights under their reinsurance agreements with Hopewell and attaching its assets here instead of waiting to be paid under the scheme, the retrocessionaires may refuse to honor their obligations to Hopewell and the scheme would fail. Woloniecki at 156. This situation, urges the petitioner, necessitates a nationwide injunction enforcing the terms and conditions of the scheme against all scheme creditors in order to protect and preserve this foreign debtor's assets located in the United States for the benefit of all scheme creditors.

## II.

Before reaching the merits of Hopewell's petition to commence an ancillary proceeding and the request for a nationwide injunction in furtherance of the scheme, I must first address the threshold issue of the petition's venue in the Southern District of New York, for General Mills claims that venue in New York is improper. This is said to be so because the action whose commencement Hopewell seeks to enjoin can only be asserted by Gold Medal in Minnesota, thereby restricting Hopewell's choice of venue to Minnesota pursuant to 28 U.S.C. § 1410(a). Hopewell takes the contrary position, arguing that venue is properly laid in New York under § 1410(c) because (i) there is no pending action in Minnesota; (ii) its exposure to potential lawsuits is not limited to one jurisdiction; and (iii) Hopewell's major United States assets, in the form of retrocessional contract rights, are located in New York.

### A. Which Venue Section Governs?

28 U.S.C. § 1410 governs the venue of ancillary proceedings under § 304 of the Bankruptcy Code. It provides:

(a) A case under section 304 of title 11 to enjoin the commencement or continuation of an action or proceeding in a State or Federal court, or the enforcement of a judgment, may be commenced only in the district court for the district where the State or Federal Court sits in which is pending the action or proceeding against which the injunction is sought.

(b) A case under section 304 of title 11 to enjoin the enforcement of a lien against property, or to require turnover of property of an estate, may be commenced only in the district court for the district in which such property is found.

(c) A case under section 304 of title 11, other than a case specified in subsection (a) or (b) of this section, may be commenced only in the district court for the district in which is located the principal

place of business in the United States, or the principal assets in the United States, of the estate that is the subject of such case.

28 U.S.C. § 1410 (1999). This venue section is keyed to the three general categories of relief available under § 304.[15] *See In re Kingscroft Insurance Company, Ltd.,* 150 B.R. 77, 80 (Bankr.S.D.Fla.1992); 1 L. King, COLLIER ON BANKRUPTCY, ¶ 4.03[1], 4–27 (15th ed. rev.1999). At first blush it appears that where an injunction against the commencement or continuation of a proceeding or of the enforcement of a judgment is sought under § 304(b)(1), § 1410(a) applies; where turnover is sought under § 304(b)(2), the venue of that turnover proceeding is dictated by § 1410(b); and, where "other appropriate relief" is sought under § 304(b)(3), § 1410(c) is the applicable venue provision. *See* COLLIER, ¶ 4.03[1] at 4–27; Marialuisa S. Gallozzi, "Insurer Insolvencies in the London Market: Consequences for the U.S. Policyholder," 4 No. 3 COVERAGE 1, 6–7 (1994) (quoting excerpt from a hearing held on January 11, 1993, before Judge Prudence C. Beatty in *In re Boys–Stones and Bird,* Case No. 92–B–46894 (PBA) (Bankr.S.D.N.Y. filed Dec. 14, 1992) (§ 1410(c) is a catch-all)).

A literal application of § 1410(a) would yield several problematic results. *See In re Evans,* 177 B.R. 193, 196 (Bankr. S.D.N.Y.1995); *In re Saleh,* 175 B.R. 422, 425 (Bankr.S.D.Fla.1994). The most common problem arises from this subsection's apparent mandate that a § 304 ancillary proceeding petition be filed in every district where there is pending an action whose continuation is sought to be en-

joined. In other words, the statute could be construed to require multiple petitions where litigation is pending in multiple jurisdictions *See Evans,* 177 B.R. at 196; *Saleh,* 175 B.R. at 425; COLLIER, ¶ 4.03[1] at 4–28. Courts and commentators agree that such a literal reading runs counter to the goals of Section 304—promoting comity, judicial economy, efficiency of administration and the avoidance of inconsistent judgments. *See Evans,* 177 B.R. at 197; *Saleh,* 175 B.R. at 426; COLLIER, ¶ 4.03[1] at 4–28; "Insurer Insolvencies," 4 No. 3 COVERAGE at 7. Those courts following a more liberal approach enter nationwide injunctions in such multiple action cases, relying on § 1410(c) and the location of the foreign debtor's principal United States assets as the basis for venue in the district issuing the nationwide injunction. *See Evans,* 177 B.R. at 196; *Saleh,* 175 B.R. at 425–26; *Kingscroft,* 150 B.R. at 80–81; "Insurer Insolvencies", 4 No. 3 COVERAGE at 7. The corollary to this approach is that § 1410(a) is viewed as speaking to a "one shot" situation, that is, where only one action is pending and no more. *See Evans,* 177 B.R. at 196; "Insurer Insolvencies", 4 No. 3 COVERAGE at 6–7.

The procedural conundrum present in this case stems from yet another ambiguity contained in § 1410(a), the direction that an ancillary proceeding to enjoin the **COMMENCEMENT** of an action be venued in the district where that action is already **PENDING**. That is draftsmanship calling to mind Lewis Carroll's fading Cheshire cat. How can an action be pending anywhere if it has not yet been commenced? *See In re Officina Conti, S.R.L.,*

---

**15.** Section 304(b) provides that "[s]ubject to the provisions of subsection (c) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may—

(1) enjoin the commencement or continuation of—

(A) any action against—

(i) a debtor with respect to property involved in such foreign proceeding; or

(ii) such property; or

(B) the enforcement of any judgment against the debtor with respect to such property, or any act or the commencement or continuation of any judicial proceeding to create or enforce a lien against the property of such estate;

(2) order turnover of the property of such estate, or the proceeds of such property, to such foreign representative; or

(3) order other appropriate relief."

11 U.S.C. § 304(b) (1999).

118 B.R. 392, 394 (Bankr.D.S.C.1989). General Mills attempts to answer this question by suggesting that § 1410(a) should be construed to include not only the district where an action is already pending but also that district where an action will be pending. In that vein, General Mills claims that Minnesota is the proper venue under § 1410(a) because Gold Medal has clearly stated its intention to bring suit to enforce its eventual arbitration award in the District Court of Minnesota. However, Hopewell points out, because there is no action pending in Minnesota, § 1410(a) has no bearing on the venue of this proceeding and § 1410(c) should govern. In so arguing, Hopewell seriously questions the statutory construction proffered by General Mills, noting that that construction would require Hopewell to anticipate where creditors will file actions and chase those creditors around the country. I agree.

■ Although there are no cases which address this particular problem with the statute,[16] requiring a petitioner to foresee where circling creditors will land and simultaneously take steps to enjoin that attack in every single instance where one is planned would produce the same unwelcome results as requiring multiple § 304 petitions to enjoin litigation in multiple jurisdictions. Plainly this would inhibit judicial economy, administrative efficiency, decisional consistency, and perhaps most important, comity. Where more than one action will or may be commenced, one district should be chosen as the local administrative hub of the foreign estate and venue of that district should be determined in accordance with § 1410(c), invoking the courts' approach to nationwide injunctions under § 304, thereby reserving § 1410(a)

for those instances where only one action has been commenced and broader injunctive relief is not needed.

■ General Mills asserts that Gold Medal's threatened action is actually that "one shot" case because Hopewell has not offered any evidence to support a threat from other creditors. On the contrary, Woloniecki testified that other creditors, for example Three Rivers, are waiting in the wings to see what transpires with Gold Medal. Woloniecki at 158. Hopewell warns that in the event Gold Medal is allowed to go forward in Minnesota and seek enforcement against Hopewell's American assets of whatever arbitration award General Mills may obtain against Gold Medal, other reinsureds will soon follow, instead of awaiting their distribution under the scheme. This domino effect, urges Hopewell, is what necessitates a nationwide injunction to protect Hopewell's scheme and its United States assets now. I believe the petitioner has shown that there is a significant likelihood that Gold Medal, if allowed to go forward, will not be alone, and, as a result, I do not consider this proceeding to be of the "one shot" type that must be venued pursuant to § 1410(a). I therefore turn to § 1410(c)'s venue provision dealing with the location of Hopewell's U.S. assets.

### B. Venue Is Proper in New York

■ Two issues must be resolved. First, are the accounts receivable assets? And if that question is answered in the affirmative, where are they located? As long as Hopewell's contractual rights under the Retrocession Treaties can be considered assets and those assets are found

---

**16.** The court in *Officina Conti* acknowledged this ambiguity. However, in that case, a creditor moved to dismiss for improper venue, arguing that no action was pending in South Carolina on which to hang venue because the action that had been pending had already been reduced to judgment in South Carolina. The court held that since the judg- ment was not yet satisfied, it still qualified as a proceeding under § 1410(a) and venue was proper in South Carolina. *See Officina Conti,* 118 B.R. at 394. *Officina Conti* is clearly distinguishable from this case, the most obvious difference being that no proceeding, under any definition, has been initiated against Hopewell.

to be located in New York, venue under § 1410(c) is appropriate.[17]

### 1. Hopewell's Rights under the Retrocession Treaties are Assets

 Hopewell and General Mills disagree as to whether Hopewell's contractual rights to payment from its retrocessionaires under the different Retrocession Treaties (also referred to as the "Accounts Receivable") are assets within the purview of § 1410(c), General Mills claiming that Hopewell's rights are those of a trustee because the Accounts Receivable, once paid, are deposited immediately into a trust account in Bermuda for the benefit of Hopewell's reinsureds and Hopewell contending that the contractual rights themselves are assets because only Hopewell is in privity with its retrocessionaires and only Hopewell can collect those Accounts Receivable from them. The gist of General Mills' argument is that Hopewell is but a trustee whose rights to the Accounts Receivable cannot be property of the estate and that, therefore, there are no assets in New York upon which to premise venue. There is a crucial error in this argument, for it equates property of the estate with assets located in the United States. An ancillary proceeding pursuant to § 304 does not create an estate under § 541 of the Bankruptcy Code because the filing of a § 304 petition does not commence a full bankruptcy case. *See In re Koreag, Controle et Revision S.A.,* 961 F.2d 341, 348–49 (2d Cir.), *cert. denied,* 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992); *In re Rubin,* 160 B.R. 269, 275 n. 3 (Bankr.S.D.N.Y.1993); *In re Brierley,* 145 B.R. 151, 160 (Bankr.S.D.N.Y.1992). Whereas I may determine the extent of the petitioner's interest in property, it is the sole province of the Bermuda court to determine the contours of the foreign debtor's estate and what belongs within and without it. *See Koreag,* 961 F.2d at 348; *Rubin,* 160 B.R. at 275. Thus, assuming without deciding that General Mills is correct that Hopewell holds the proceeds of the Accounts Receivable in trust for its reinsureds despite Mr. Woloniecki's testimony to the contrary (although he admittedly is not an expert in the field of Bermuda trust law), the fact that Hopewell's rights in the proceeds of the Accounts Receivable would not be property of the foreign estate under § 541 of the Bankruptcy Code has no bearing on my determination whether Hopewell has assets in New York. Section 1410(c) is predicated on the location of U.S. assets, not on property of the estate.[18] Indeed, the section never mentions property of the estate, foreign or otherwise. This distinction would not appear to be accidental given the secondary nature of § 304 proceedings, which are meant to assist in the administration of a foreign bankruptcy. What must be determined, therefore, is whether the Accounts Receivable are assets and, if so, whether they be found primarily in New York.

 Questions of venue are procedural in nature, *see Jones v. Weibrecht,* 901 F.2d 17, 19 (2d Cir.1990); 17 Coquillette, Moore's Federal Practice 3D, ¶ 110.01[2], 110–14 (3d ed.1999), and are governed by federal law where provided, including federal common law where it exists. *See Stewart Organization, Inc. v. Ricoh Corporation,* 487 U.S. 22, 28, 108 S.Ct. 2239,

---

17. I do not mean to suggest that the presence of assets is a necessary jurisdictional predicate for injunctive relief under § 304. *See Haarhuis v. Kunnan Enterprises, Ltd.,* 177 F.3d 1007, 1012 (D.C.Cir.1999) (holding that a bankruptcy court's subject matter jurisdiction under §§ 304(b)(1)(A)(i) and (b)(3) does not require the presence of assets in the United States); *Sales v. Manning (In re Manning),* 236 B.R. 14, 20 (9th Cir. BAP 1999); *Universal Casualty & Surety Co. Ltd. v. Gee (In re*

*Gee),* 53 B.R. 891, 897 (Bankr.S.D.N.Y.1985). We are discussing venue, no one having questioned subject matter jurisdiction. *See Haarhuis,* 177 F.3d at n. 2.

18. Note that this is in contradistinction to the wording of 28 U.S.C. § 1410(b), the turnover provision, which refers to "turnover of property of an estate."

101 L.Ed.2d 22 (1988) (holding that a venue dispute under 28 U.S.C. § 1404(a) is governed by federal law); MOORE'S, ¶ 124.01[1], at 12–10; *cf. Jones*, 901 F.2d at 19 (holding that state law does not control in a diversity case because venue is a procedural issue). Since Congress has provided a specific federal venue statute, 28 U.S.C. § 1410, to be applied in bankruptcy cases involving a petition ancillary to a foreign proceeding, I turn to what can be termed federal common law to determine whether accounts receivable are assets for purposes of determining venue.

■ Bankruptcy courts that have addressed this issue have found that accounts receivable are assets within the purview of 28 U.S.C. § 1408, the general bankruptcy venue provision. *See In re J & L Plumbing & Heating, Inc.*, 186 B.R. 388, 391–92 (Bankr.E.D.Pa.1995); *In re Washington, Perito & Dubuc*, 154 B.R. 853 (Bankr. S.D.N.Y.1993); *In re A & D Care, Inc.*, 86 B.R. 43 (Bankr.M.D.Pa.1988). There being no tangible difference between the use of the term "assets" in § 1408 and § 1410(c), assets under one section should also be assets under the other. However, because General Mills argues that the Accounts Receivable are not even assets of Hopewell, the issue arises of which law governs. Federal bankruptcy law does not address the ownership or proprietary nature of accounts receivable; property rights in bankruptcy are governed by state law. *See Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

It seems only logical to draw an analogy here to *Koreag* and the line of cases following it. *Koreag* dealt with the turnover provisions of § 304. In that context, the Second Circuit held that the estate of the foreign debtor is determined by the law of the jurisdiction in which the foreign proceeding is pending, but that other applicable law served to define that estate's interest in property located in the United States. *Koreag*, 961 F.2d at 348. The court reasoned by analogy to the filing of a traditional chapter 11 case where an estate pursuant to § 541 is created, explaining that just as federal bankruptcy law outlines the confines of property of the estate, local state law is determinative of the nature of the debtor's interest in particular property. *Id.* at 349. ("We see no reason why a similar controlling allocation as to controlling law should not apply in § 304 cases."). Inasmuch as § 304(b)(2) (the turnover provision) requires an "antecedent determination of property interests as a condition to the turnover of property to a foreign representative," the venue provision, albeit on a procedural level, also necessitates an "antecedent determination" that the claimed assets are "the principal assets in the United States, of the estate that is the subject of this case." *Id.* at 348; 28 U.S.C. 1410(c). Whether or not the Accounts Receivable are part of the foreign estate is without my jurisdiction and of no moment to the problem at hand, but Hopewell's ownership interest of the Accounts Receivable under U.S. law is and I must decide that issue before I can determine whether New York is the proper venue for this ancillary proceeding. Therefore, in accordance with *Koreag*, I turn to the local law of New York.

### 2. Hopewell Owns the Accounts Receivable

■ Under New York law, the bundle of all rights created by a contract or agreement is an intangible personal property interest. *See ABKCO Industries, Inc. v. Apple Films, Inc.*, 39 N.Y.2d 670, 674, 385 N.Y.S.2d 511, 350 N.E.2d 899 (1976). Accounts receivable fall into this category. *See id.* (Obligation to pay under a licensing agreement held to be an intangible property interest). The Accounts Receivable are assets belonging to Hopewell because the right to collect them belongs exclusively to Hopewell, the only entity in privity with the retrocessionaires under the Retrocession Treaties. It is Hopewell that is the holder of the bundle of all rights under the Retrocession Trea-

ties. Although payment is to be routed directly to a specific bank account in Bermuda which may or may not be a trust, this does not lessen or diminish Hopewell's personal property interest in the contractual rights to collect payment. To put it crudely, absent Hopewell, no one gets the money.

■ The location of intangible personal property interests such as accounts receivable is the situs of the account debtor or the party whose obligation it is to perform under the contract. *See id.* at 675, 385 N.Y.S.2d 511, 350 N.E.2d 899; *J & L Plumbing,* 186 B.R. at 392; *In re World of English, N.V.,* 16 B.R. 817, 819 (Bankr. N.D.Ga.1982); *cf. Harris v. Balk,* 198 U.S. 215, 225, 25 S.Ct. 625, 49 L.Ed. 1023 (1905) (addressing personal jurisdiction of garnishee, the Court held that debts have no locus or situs but accompany the account debtor everywhere); *but see Washington,* 154 B.R. at 861 (formulating an approach based on the Uniform Commercial Code's perfection of security interest). It is unchallenged that the majority of the U.S. retrocessionaires are located in New York. As a result, Hopewell indisputably has its principal U.S. assets in New York and venue is properly laid here pursuant to § 1410(c).

### III.

Hopewell seeks injunctive relief pursuant to §§ 304(b)(1) and (b)(3), the granting of which is predicated on Hopewell's establishing that it satisfies the criteria set forth in § 304(c). *See In re Treco,* 229 B.R. 280, 284 (Bankr.S.D.N.Y.1999); *Brierley,* 145 B.R. at 168. Before addressing those substantive requirements, however, Hopewell must first successfully clear the two procedural obstacles contained in § 304(a). *See* 11 U.S.C. § 304(a) (1999); *Universal Casualty & Surety Co. Ltd. v. Gee (In re Gee),* 53 B.R. 891, 897 (Bankr.S.D.N.Y. 1985). First, the board of directors[19] of Hopewell must qualify as a "foreign representative" and second, the scheme and the

process of its sanctioning in Bermuda must fall into the category of "foreign proceedings" which may be the subject of an ancillary case pursuant to § 304. Gold Medal and General Mills argue that Hopewell's petition slips on both procedural stepping stones.

It is important to note that this case differs in two important and related ways from other reported § 304 decisions. The "foreign proceeding" here is a stand-alone scheme of arrangement; it does not exist in tandem with another statutory vehicle for debt manipulation such as a voluntary liquidation, administration or court-ordered winding-up. This scheme is also believed to be a solvent one. As such, the usual players in the reported § 304 jurisprudence where insolvent liquidations (voluntary or mandatory) and administrations are at issue do not have a role in this case.

Because the definition of a "foreign representative" includes the requirement that the representative emanate from a "foreign proceeding," Hopewell's board of directors cannot be a foreign representative unless its stand-alone scheme of arrangement constitutes a foreign proceeding. So it is to that issue that I turn.

### A. The Scheme of Arrangement is a Foreign Proceeding

The Bankruptcy Code defines a "foreign proceeding" as

a proceeding, whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension or discharge, or effecting a reorganization.

11 U.S.C. § 101(23) (1999). Gold Medal and General Mills, in disputing Hopewell's characterization of the scheme as a foreign

---

**19.** The board of directors are also referred to as the scheme administrators.

proceeding, have zeroed in on the ongoing or supervisory role of the court over the scheme. They argue that stand-alone schemes seeking recognition under § 304, of which this is the pioneer in the United States, are not in and of themselves proceedings; rather, they say, schemes have only been viewed as proceedings when they exist in conjunction with a more structured and court-supervised form of administration or liquidation.

### 1. What is a Foreign Proceeding?

■ The ordinary meaning of the word "proceeding" is "a particular step or series of steps adopted for doing or accomplishing something." Webster's Third New International Dictionary (Merriam–Webster, Inc.1981).[20] Plugging that definition into the Bankruptcy Code's definition of "foreign proceeding," we see that a foreign proceeding is a foreign judicial or administrative process whose end it is to liquidate the foreign estate, adjust its debts or effectuate its reorganization. *See In re Xacur,* 216 B.R. 187, 195 (Bankr.S.D.Tex.1997); *In re Taylor,* 176 B.R. 903, 907 (Bankr. C.D.Ca.1995); *In re Kingscroft Insurance Company, Ltd.,* 138 B.R. 121, 124 (Bankr. S.D.Fla.1992). No one disputes that the scheme in this case is intended to do just that—liquidate Hopewell's assets and debts to its creditors in an attempt to pay all of them in full, with interest, within a fixed time frame.[21] *See* scheme at § 1.3.1.

■ Gold Medal and General Mills disingenuously suggest that Hopewell's proceeding is no longer a foreign proceeding because the scheme has been sanctioned and the court's file therefore closed and sent to storage. There are at least three reasons why this argument is ridiculous. First, as Moss testified, creditors still have access to the Bermuda court in conjunction with the scheme notwithstanding that they may have to purchase new index numbers. Specifically, after a sanctioned scheme becomes statutorily effective,[22] the court drops into the background—not so unlike the role of a domestic bankruptcy court after it confirms a chapter 11 plan—but remains available to creditors to resolve classification disputes, enforce the provisions of the scheme and review actions by the scheme administrators. Moss at 411–12, 481–82; Potts at 1770–72. To focus on the fact that Bermuda procedure requires a different summons to be issued or a different index number to be purchased each time the court's aid is sought once the scheme has become effective misses the point, which point is that the court is available to creditors and members to redress any missteps by Hopewell under the scheme.

■ Second, the Bankruptcy Code defines "foreign proceeding" as a judicial or administrative proceeding "for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization[.]" 11 U.S.C. § 101(23). Until one of those objectives has been accomplished, the proceeding should be understood to be pending, regardless of whether or not the case file is

---

**20.** I prefer the general usage definition to that contained in Black's Law Dictionary as being more reflective of common understanding. *See Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. Partnership,* 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (the Supreme Court admonishing the inferior courts to look to the plain meaning of a word when interpreting a statute and using Webster's Collegiate Dictionary to define "neglect").

**21.** No one disputes either that Hopewell had the appropriate jurisdictional basis for the proceedings which it commenced in Bermuda.

**22.** As the experts agreed, § 99 of the Companies Act 1981 imposes three conditions precedent before the scheme acquires statutory effect: it must be approved by the requisite majorities of creditors and members present and voting; it must be sanctioned by the court; and it must be filed with the Registrar of Companies. Moss at 396, 402, 408, 409; Transcript of Trial Testimony of Robin Potts, dated November 12, 1998 at 1764, to be referred to as "Potts at _____." Robin Potts, Q.C., was qualified as an expert in British and Bermuda insolvency law. Potts at 1753.

technically open or shut. *Cf. Becker Steel Co. v. Hicks*, 66 F.2d 497, 499 (2d Cir.) (Hand, Augustus N., J.), *cert. denied*, 290 U.S. 667, 54 S.Ct. 88, 78 L.Ed. 576 (1933) ("Ample authority exists for holding that, though a final judgment has been entered, the cause is still pending until the judgment is satisfied."). Here, distribution to Class B creditors has not been completed. The scheme sets an outside distribution date of June 30, 2001. Without a doubt, then, the objectives of this scheme have not been fulfilled as yet and, if all other conditions for the granting of comity are met, assistance should be granted to help implement the scheme of arrangement which the Bermuda court has sanctioned.

Third, were Gold Medal and General Mills correct that a scheme, once sanctioned, is no longer eligible for our assistance, we would grant ancillary petitions in advance of the sanctioning of schemes of arrangement, but refuse such relief once the schemes had received court approval. This result would stand the notion of comity on its head by our refusal to grant assistance for the very reason that the foreign court had acted. *See Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895) (Comity "is the recognition which one nation allows within its territory to the legislative, executive or **judicial acts** of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its law.") (Emphasis added).

Thus, I conclude that the sanctioning and registration of the scheme are no bar to its eligibility as a "foreign proceeding."

## 2. The Scheme Provides for Substantial Judicial Involvement and Access to the Bermuda Court

 Few courts have treated with the question of what constitutes a foreign proceeding, but what one that has considered the issue looks for in the foreign candidate is the amount of judicial involvement and supervision or, conversely, the degree of access to the court available at various stages to creditors so that they may voice any objections they may have. *See In re G.C.K. Tam*, 170 B.R. 838, 843 (Bankr. S.D.N.Y.1994); *In re Ward*, 201 B.R. 357, 361 (Bankr.S.D.N.Y.1996).

 It is useful to address this topic from the perspective of the minimum amount of judicial involvement required. For example, a creditors' voluntary liquidation is a voluntary winding-up that is conducted by the company and its creditors without any required court intervention. *See Ward*, 201 B.R. at 359–60 (Zambian voluntary liquidation); Moss at 448. In evaluating the structure of such a proceeding in *Ward*, the court found that it afforded creditors the following rights: 1) to apply to the High Court at the inception of the liquidation for the replacement of the company-selected liquidator; 2) to petition the High Court at any time for the conversion of the proceeding into a judicial winding-up, which is carried out under stricter supervision of the High Court; 3) to appeal orders issued by the High Court during the course of the winding-up; and 4) to appeal claims determinations by the liquidator. *See Ward*, 201 B.R. at 360–61.[23] Further, if the creditor body chose to enter into a scheme of arrangement with the company (whose aspects under Zambian law are almost identical to those under Bermuda law), dissenting creditors

**23.** Judge Garrity, in *Ward*, thoroughly distinguished his prior decision, *Tam*, which also involved a creditors' voluntary liquidation but under the law of the Cayman Islands, another sister common law jurisdiction. He explained that the voluntary liquidation in *Tam* did not provide for any court supervision whatsoever, nor for ready access by creditors

to the court. *See Ward*, 201 B.R. at 362. He further reasoned that under Zambian law the rights of creditors to be heard were virtually identical under the judicial or voluntary winding-up scenarios and that the voluntary winding-up was being conducted for the collective benefit of all creditors, none of which factors existed in *Tam. See id.*

had a right to appeal the order sanctioning the scheme to the High Court. *See id.* The court also noted that the company-selected liquidator required court approval in order to have dealings with the company or its assets. *See id.* The court construed this necessary approval by the Zambian court as its placing an imprimatur on the company-selected liquidator.

The court thus concluded that the Zambian liquidation was conducted by a court-sanctioned liquidator, with similar responsibilities to an official liquidator, whose duty it was to act for the benefit of all creditors, that there was substantial judicial oversight, that there was ready access to the High Court and appellate court to redress creditor grievances and that the winding-up was conducted in accordance with rules and procedures consistent with our notions of fairness and due process. *See id.* at 361. As a result, the court held the Zambian voluntary winding-up qualified as a foreign proceeding under the Bankruptcy Code.

Under § 99 of the Companies Act 1981, in force in Bermuda, once a scheme of arrangement has been proposed between a company, its creditors (or a class of creditors) and its members (or a class of members), one of these parties must seek leave of the court to hold the creditors' and members' meetings. *See* The Companies Act 1981, § 99(1) (Appleby, Spurling & Kempe, 1996), to be referred to as the "Act at § ___." As Kawaley testified, the board of directors of Hopewell, as scheme administrators, made this application to the court by *ex parte* originating summons. Included in this application were the proposed explanatory statement, the proposed scheme, some financial information, proposed notices to creditors and members and proposed proxy forms including the proposed valuations of the claims for voting purposes. Kawaley explained that the purposes of this application were first, to obtain the court's approval of the form and content of the notices and proxy forms; second, to seek direction from the court regarding the manner in which the meetings of creditors and members were to be conducted; and third, to obtain the court's leave to summon the meetings according to the court's instructions. Kawaley at 631–34. At this first hearing, Kawaley outlined for the court some of the scheme's more salient and unusual features, (Kawaley at 643–44), after which the judge signed an order approving the notices and the forms of proxy and setting forth the procedures for voting. Kawaley at 644–45. Moss testified that the court must find the scheme to be *prima facie* sanctionable before it will issue an order such as this one. Moss at 396.

Section 99 also sets forth the number of votes required (75% in value of those present and voting in each class) for the scheme to be approved by each class of creditors and members. *See* Act at § 99(2). Section 100 of the Act requires that a notice summoning the meeting be sent to each creditor and member accompanied by an explanatory statement detailing the effect of the scheme on creditors and members. *See* Act at § 100(1)(a). Section 100 also authorizes the court to fine the officers of the company for failing to comply with any of these requirements. *See* Act at § 100(4).

After the creditor and member meetings, Hopewell petitioned the Bermuda court to sanction the scheme. This entailed submitting to the court the full scheme package as it was received by creditors and members as well as the reports of the class votes. After the hearing, the court entered an order sanctioning the scheme which was filed with the Registrar the following day in accordance with § 99(3) of the Act. Moss testified that the Bermuda court will sanction a scheme only if it is satisfied that it is fair and advantageous to creditors. Moss at 403.

Creditors and members had several opportunities to object. When they received their proxy forms, creditors and members were made aware that if they disagreed with the valuation of their claim for voting

purposes, they should return the form with their proposed valuation and documentary evidence in support of that proposed figure. The May 23, 1995, Order authorizing the class meetings to be convened specifically stated that every claim valuation was subject to objections being lodged at a class meeting as well as at the sanction hearing. Kawaley at 644–45. Creditors and members clearly had the option of not voting in favor of the scheme. A third opportunity to object was at the sanction hearing itself. Kawaley at 620–21. Both experts agree that the time to raise an objection to the scheme is either when the scheme is under consideration or, at the latest, at the sanction hearing itself.[24] Moss at 408, 431; Potts at 1857. Once the scheme is sanctioned, a disaffected creditor or member may appeal the Sanction Order. Moss at 407. As already mentioned, resort to the court may be had even *after the scheme becomes statutorily effective.* Moss at 411–12; Potts at 1770–72.

There is significant judicial involvement in this scheme process. There are two mandatory court appearances, the first, on the *ex parte* summons to convene the class meetings and the second, on the sanctioning of the scheme. Moss at 449. That is two more than in the creditors' voluntary liquidation in the *Ward* case. Both hearings required the court to review the materials submitted and evaluate them. Specifically with respect to the first hearing, before the court could allow Hopewell to go forward and send out notices to the creditor body, summon the class meetings and establish voting procedures, the judge had to be satisfied that the scheme was *prima facie* sanctionable and that the board of directors of Hopewell was an appropriate scheme proponent. With regard to the second hearing, although the sanctioning of the scheme is necessarily dependent on its receiving the affirmative vote of 75% in value of those creditors present and voting in each class, the court

plays a significant role in that it must assure itself that the scheme is in the best interests of creditors and members. Lastly, creditors and members had a plethora of opportunities to object to the scheme before it was sanctioned and continue to have avenues available to them to make their voices heard in opposition to actions taken by Hopewell. *See Ward,* 201 B.R. at 361.

As Hopewell suggests, a scheme can be analogized to a prepackaged chapter 11 plan. In the latter scenario, a company files for chapter 11 relief having already formulated a plan, prepared and disseminated a disclosure statement and solicited votes. After the filing of the petition, the court is apprised of the important features of the plan and of the identities of any potential objectants to its confirmation. In the normal course, the next time the debtor will come back to court is for the combined hearing to consider approval of the disclosure statement and confirmation of the plan. *See Procedural Guidelines for Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of New York* at III. A. Once the plan is confirmed and becomes effective, as in all other chapter 11 cases, the court's jurisdiction is narrowed. The similarities between Hopewell's scheme and a pre-packaged chapter 11 case are striking, sufficiently so that no argument can be made that qualifying Hopewell's scheme as a foreign proceeding under the Bankruptcy Code would offend any of our notions of fairness or due process, particularly since the scheme process involved more, rather than less, judicial oversight at the inception of the proceedings than does a pre-packaged chapter 11 case.

I therefore conclude that Hopewell is the subject of a foreign proceeding.

*B. Hopewell's Board of Directors is Eligible to Be a Foreign Representative*

A "foreign representative" is defined under § 101(24) of the Bankruptcy

---

24. Potts testified to this point with the standing *caveat* that the objectant had been given notice of the scheme and that the scheme classification was proper.

Code as a "duly selected trustee, administrator, or other representative of an estate in a foreign proceeding." *See* 11 U.S.C. § 101(24) (1999). Gold Medal and General Mills would have me hold that a board of directors cannot be a foreign representative because it is not appointed by the court to be in charge of the scheme and is therefore neither a trustee nor a fiduciary of the foreign estate. But absolutely nothing in the statute requires the foreign representative to be appointed by a court. In fact, that hoped-for construction would render the definition of a "foreign proceeding" nonsensical inasmuch as a "foreign proceeding" is defined to include non-judicial proceedings. In addition, although many § 304 cases involve judicial windings-up and administrations with court-appointed provisional liquidators and administrators, United States bankruptcy courts have also recognized creditor-elected or creditor-appointed liquidators in voluntary windings-up (creditors' voluntary liquidations) to be foreign representatives. *See Ward*, 201 B.R. at 360; *Kingscroft*, 138 B.R. at 124.

*Kingscroft*[25] involved four insurance companies (three British and one Bermuda), all of which were insolvent. Their respective boards of directors decided to file voluntary winding-up petitions in London, England, and Bermuda with the expectation of entering into schemes of arrangement with their different creditors. The ancillary petitions were filed in the Florida bankruptcy court by individual directors on behalf of the boards of directors of each company. Affidavits were submitted to the court attesting to the fact that, under both British and Bermuda law,

boards of directors of companies under pending winding-up petitions retain their authority to manage the companies. *See Kingscroft*, 138 B.R. at 124. Judge Cristol likened the petitioners in *Kingscroft* to debtors in possession and qualified them as foreign representatives. *See id.* In so doing, he implicitly recognized that a board of directors or, as in that case, its representative, may properly file a § 304 petition for ancillary relief on behalf of a company because the company itself, being a legal fiction, cannot do so.

Hopewell's board of directors is no different from any of the petitioners in *Kingscroft*. Through its board of directors, Hopewell decided that it would be in the best interest of its shareholders[26] to sell its book of business and propose a scheme of arrangement to its creditors as a means of paying off its long-term liabilities in short order. Under our insolvency system, it is the board of directors of a corporate debtor which must authorize the company by corporate resolution to file for chapter 11 relief. Ordinarily, the debtor is then retained in possession. It is difficult to swallow the notion pushed by Gold Medal and General Mills that we could recognize a debtor in possession, managed as it is by its board of directors, *see Manville Corp. v. Equity Security Holders Committee (In re Johns–Manville Corp.)*, 801 F.2d 60 (2d Cir.1986) (general principles of corporate governance inhere in reorganization proceedings in the absence of bad faith warranting injunctive relief), in a full-scale bankruptcy case, but refuse to recognize another country's equivalent of a debtor in possession in an ancillary case, especially

---

**25.** The voluntary winding-up petitions were filed in August, 1990. By March, 1992, the companies having failed to acquire the needed creditor support, the High Court of Justice in London, England, placed the companies into provisional liquidation and appointed provisional liquidators who were authorized to and subsequently did file further § 304 petitions in the Southern District of New York. *See Kingscroft*, 150 B.R. at 79. The provisional liquidators thereafter moved to dismiss the Florida § 304 proceedings, which

relief was granted. *See id.* at 81. Walbrook Insurance Company, Ltd., another British insurance company, joined the other four petitioners in New York. The case has been commonly referred to as KWELM. *See Allstate Ins. Co. v. Hughes (Kingscroft Insurance Company, Ltd.)*, 174 B.R. 884 (S.D.N.Y.1994).

**26.** Remember, Hopewell is thought to be solvent.

when, as here, the company and its officers are charged under the scheme with the obligation of carrying out its provisions. *See* scheme at § 4.2.1.

A scheme of arrangement is a "facilitation." Moss at 427; Potts at 1819. The same can be said of a plan of reorganization. Just as solvent schemes are permissible under English and Bermuda law, (Moss at 427), solvent chapter 11 cases are permissible under U.S. law. Where solvency is projected, as here, a scheme of arrangement need not be predicated on a winding-up petition. Moss at 428–29. Under such circumstances, unusual in Bermuda as they are in the United States, there are no court-appointed or creditor-selected liquidators required. Moss at 428–29. Much the same distinction would be true as between a chapter 11 and a chapter 7 proceeding. *See Kingscroft*, 138 B.R. at 125. Plainly, the Bermuda court having permitted solicitation of votes on (and having ultimately sanctioned) the scheme, which provides for the company to implement it, the board of directors, as the management of the company, constitutes a "duly selected ... representative of an estate."

Because I have concluded that Hopewell is eligible for relief under § 304, we move on to whether such relief ought be afforded.

### IV.

■■■■■ The Bankruptcy Code, through § 304, provides for a flexible approach to international insolvencies. *See Koreag*, 961 F.2d at 348 (bankruptcy court is given broad latitude in fashioning an appropriate remedy in ancillary proceedings); *Rubin*, 160 B.R. at 274 (*citing Gee*, 53 B.R. at 896) ("Congress provided a mechanism for the courts of this country to aid foreign courts and accommodate the increasing number of foreign insolvency proceedings with extraterritorial effects within the United States."). "If any philosophy can be attributed to the structure of the Code it is that of deference to the country where the

primary insolvency proceeding is located, ..., and flexible cooperation in administration of assets." *Hong Kong and Shanghai Banking Corporation, Limited v. Simon (In re Simon)*, 153 F.3d 991, 998 (9th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999).

■■■■■ An ancillary proceeding does not commence a full-scale bankruptcy case. From this principle flow two corollaries: an ancillary proceeding does not create an estate under § 541 of the Bankruptcy Code nor does it confer on the foreign debtor the full panoply of rights that would otherwise be available to a debtor or trustee under chapters 7, 9, 11, 12 or 13 of the Bankruptcy Code. *See Koreag*, 961 F.2d at 357; *In re Treco*, 227 B.R. 343, 349 (Bkrtcy.S.D.N.Y.1998); *Brierley*, 145 B.R. at 159, 161; *Gee*, 53 B.R. at 896. What it does do is lend a "helping hand" to the foreign court where the main or primary proceeding is pending by enabling the foreign representative to take action in the United States "to prevent the piecemeal distribution of assets ... by means of legal proceedings initiated in domestic courts by local creditors." *Koreag*, 961 F.2d at 348 (*citing Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 454–55 (2d Cir. 1985) and *Victrix Steamship Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713–14 (2d Cir.1987)); *In re Bird*, 229 B.R. 90, 94 (Bankr.S.D.N.Y.1999); *Brierley*, 145 B.R. at 167.

### A. Hopewell Meets the § 304(c) Criteria

■■■■■ Section 304 states in relevant part that, after trial on an ancillary petition, the court may:

(1) enjoin the commencement or continuation of—

 (A) any action against—

 (i) a debtor with respect to property involved in such foreign proceeding; or

 (ii) such property; or

 (B) the enforcement of any judgment against the debtor with respect to such property, or any act or the commence-

ment or continuation of any judicial proceeding to create or enforce a lien against the property of such estate; or

. . .

(3) order other appropriate relief.

11 U.S.C. §§ 304(b)(1) and (b)(3). My determination of whether to grant the injunctive relief Hopewell seeks must address the specific factors enunciated in § 304(c) while taking into consideration what will best assure the economical and expeditious administration of Hopewell's foreign estate. *See Haarhuis,* 177 F.3d at 1013; *Treco,* 227 B.R. at 349; *Gee,* 53 B.R. at 897. These factors [27] include:

(1) the just treatment of all holders of claims against or interest in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed in this title; and

(5) comity.

11 U.S.C. § 304(c) (1999).

### 1. Avoidance Actions and Priority of Distribution

■■■■■ There can be little doubt of the importance in the typical scenario of an insolvent debtor of the factors of § 304(c) relating to prevention of fraudulent or preferential dispositions of the estate's property and distribution of the proceeds of the estate substantially in accordance with our own system of priorities. The ability to avoid preferential and fraudulent transfers to ensure equality of distribution of proceeds of the estate is one of the most fundamental tenets of our bankruptcy system. *See In re Culmer,* 25 B.R. 621, 628

(Bankr.S.D.N.Y.1982) *(citing Israel–British Bank (London), Ltd. v. Federal Deposit Insurance Corp.,* 536 F.2d 509, 513 (2d Cir.), *cert. denied sub nom. Bank of the Commonwealth v. Israel British Bank (London), Ltd.,* 429 U.S. 978, 97 S.Ct. 486, 50 L.Ed.2d 585 (1976)). However, where an estate is solvent, that is, where there are sufficient funds to pay all creditors in full, the goals of maximizing the estate for the benefit of all creditors and dividing up that estate so as to achieve equality among class members are much less strongly implicated.

There is no need to recover assets in order to ensure equality of distribution when there is a large enough roast in the oven to feed all the hungry mouths. For this reason, under our own law, a trustee's or debtor in possession's avoidance powers can only be exercised for the benefit of creditors, *see Kennedy Inn Associates v. Perab Realty Corp. (In re Kennedy Inn Associates),* 221 B.R. 704, 714 (Bankr. S.D.N.Y.1998), and not for the benefit of equity. *See In re Best Products, Co., Inc.,* 168 B.R. 35, 57 (Bankr.S.D.N.Y.1994), *appeal dismissed,* 177 B.R. 791 (S.D.N.Y. 1995), *appeal reinstated and aff'd,* 68 F.3d 26 (2d Cir.1995). So strong is this principle that a transfer, avoidable as fraudulent by a creditor, is considered valid as between a grantor and grantee. *See id.* (because a fraudulent transfer is voidable by creditors only, it is not remarkable that, as between the parties to the transfer, the law regards the transfer as real and binding).

Where an estate has insufficient funds to pay all creditors what they are owed, the statutory distribution scheme brings order to the debtor's universe by ranking the estate's creditors according to the strengths of their interests or rights. Where the debtor is solvent, although the priority framework may technically still

---

27. The sixth factor is inapplicable because it pertains to "the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns." 11 U.S.C. § 304(c)(6) (1999); *Treco,* 229 B.R. at 284 *(citing In re Gercke,* 122 B.R. 621, 634 (Bankr. D.D.C.1991)).

apply, it has no meaningful effect on the debtor or the estate's creditors, for if there is enough money to go round, the order in which creditors are paid is not of extreme importance.

Because Hopewell is believed to be solvent, its scheme of arrangement is not accompanied by either a winding-up (voluntary or mandatory)[28] or an administration and there are therefore no Bermuda statutory provisions in place governing avoidance powers or priority of payment. The scheme itself provides, however, that Class A creditors be paid before creditors in Class B. Whereas the Class A creditors hold agreed claims and the Class B creditors do not, the legal basis for the types of claims contained in the two classes is the same. Remember, though, that the scheme was unanimously adopted, all creditors, including Gold Medal, having voted in its favor.[29]

▆▆ Moss testified that Hopewell's scheme of arrangement is analogous to a plan of reorganization. Moss at 393; *see* *Kingscroft*, 138 B.R. at 125 (operation under a scheme pursuant to § 99 of the Bermuda Companies Act 1981 may be analogized to adoption of a plan of reorganization under chapter 11 of the Bankruptcy Code). Under U.S. law, a chapter 11 plan which is accepted by all impaired classes need not follow the strict rules of priority of distribution which would apply in a chapter 7 liquidation. Rather, such a plan may provide any distribution to a class which the impaired classes accept so long as, if any individual creditor in the impaired class votes against the plan, it can be shown that that creditor's class is receiving at least what it would receive in a chapter 7 liquidation. *See* 11 U.S.C. §§ 1129(a)(7)(A) and (a)(8)(A) (1999). In other words, creditors in chapter 11 cases often receive distributions which vary from

that which the strict rules of priority would produce.

Here, even if the order of distribution set forth in the scheme differs from what would otherwise be required under Bermuda law, Hopewell's creditors consented to that different treatment—after full disclosure. In fact, Moss testified that where there is a solvent scheme, there is no reason to implement strict *pari passu* distribution because the creditors can agree that it is in their best interests not to do so (Moss at 435), knowing that they will get paid in full, albeit not all at the same time. The differentiation in treatment of Hopewell's two classes is no different from what occurs so frequently in consensual plans of reorganization in the United States and, therefore, should not raise Uncle Sam's eyebrows.

In the context of a solvent scheme, accepted by all classes, neither the omission of avoidance powers nor any deviation from the usual distributive provisions applicable in windings-up is cause for any concern.

### 2. Just Treatment of Claim Holders

Gold Medal and General Mills argue that Gold Medal was unfairly treated by the scheme because 1) Gold Medal was forced into Class A and deprived of a larger claim with more voting power in Class B, 2) the scheme was drafted to favor Minnetonka in that Minnetonka's entire liquidated claim was recognized whereas Gold Medal's unliquidated claim was not, and 3) Gold Medal should have been placed in a separate class with all other claimants whose governing law was being changed to that of Bermuda through the scheme. Not one of these arguments, nor any other, was advanced by Gold Medal in Bermuda. Gold Medal had notice of all of the scheme's provisions and their intended effects, but nevertheless did not

---

**28.** The scheme des provide, however, that at its termination, Hopewell will either be wound up or sold. *See* scheme § 5.4.

**29.** It should be noted that even if Gold Medal had abstained from voting, Classes A and B would have still accepted the scheme.

vote against the scheme, did not object to the valuation of its claim for voting purposes, did not object at the sanction hearing, did not appeal the scheme and did not seek to undo the Bermuda Injunction. Whether Gold Medal and its counsel were asleep or made a strategic determination not to challenge the scheme (and, indeed, to accept benefits thereunder), the bottom line is the same: Gold Medal forewent the many opportunities it had under Bermuda procedure to raise the very issues it seeks to collaterally raise now. *See Gee,* 53 B.R. at 902.

### a. *The Classification and Voting Power of Gold Medal's Claim*

Gold Medal complains that it should have been assigned the full voting power of the Pesticide Claim instead of the comparatively small $25,000 Class A pollution loss commutation. To overcome the fact that it affirmatively accepted the claim's valuation, Gold Medal and General Mills argue that Hopewell misled them, that notice of the scheme was insufficient and that the scheme and explanatory statement were unclear. But the facts simply do not bear out these contentions.

Hopewell's scheme of arrangement and explanatory statement fully outline the scheme's classification criteria for voting purposes: creditors were put in Class A if they held claims that were agreed as of June 1, 1995, and all other creditors fell into Class B, Woloniecki at 125–26, 140; *see* scheme at §§ 1.1.1, 2.6.1; expl. stmt. § 3.2. A creditor was permitted to vote in only one class but could include any unliquidated amounts in the valuation of his or her claim for voting purposes pursuant to the procedures contained in and made a part of the proxy forms. Kawaley at 647;

Brice at 1271; *see* scheme at § 4.5.1; expl. stmt. at § 4.3.[30] So Gold Medal's and General Mills' position that this was not properly explained to them is nonsense. Moreover, they sent the scheme documents to in-house counsel as well as outside counsel who surely were capable of understanding them. Hopewell cannot be faulted for not placing Gold Medal in Class B for voting purposes on account of the Pesticide Incident or, conversely, for failing to include the Pesticide Claim in its valuation of Gold Medal's Class A claim for voting purposes when Gold Medal had never submitted to Hopewell a proof of loss.[31]

Gold Medal had a Class A agreed claim for $25,000 as of June 1, 1995. Under the scheme, where claims were disputed or unliquidated as of June 1, 1995, a case reserve would be set based on a creditor's submission of a proof of loss to IRMG and a recommendation from its independent loss adjuster of the estimated value of the disputed or unliquidated claim. The estimation procedure was to be carried out in accordance with the scheme with resort to arbitration if necessary. Voting power was then assigned according to the weight of a creditor's claim, including the liquidated as well as unliquidated portions of it. For example, Minnetonka had a Class A claim worth $49 million, which was the agreed amount, but a $59 million Class A vote, which included the case reserve on account of the unliquidated amount. Without a case reserve, a disputed claim could not be estimated and could not be assigned any voting weight.

Gold Medal's cries of unfairness that it received no Class B claim reflecting the Pesticide Claim fall on deaf ears because Gold Medal never submitted a proof of loss nor did it follow any of the procedures for

---

**30.** Although a creditor could only vote in one class, this did not in any way preclude a creditor from receiving distributions on account of both types of claims. *See* scheme at § 2.6.1(a).

**31.** It bears mentioning that under U.S. law in a chapter 11 case a scheduled creditor with a

disputed, unliquidated claim who has not filed a proof of claim would not be entitled to vote for or against a plan of reorganization, for only a creditor with an allowed claim may vote and such a creditor would not have an allowed claim. *See* 11 U.S.C. §§ 1126(a) and 502(a) (1999); Fed.R.Bankr.P. 3003(c)(2).

estimating and setting a case reserve for the Pesticide Claim. Hopewell did not trick Gold Medal into not realizing the maximum voting value possible; Gold Medal deprived itself of the value of the Pesticide Claim for voting purposes by not giving IRMG the necessary information to set a case reserve.[32]

As far as Hopewell was concerned, the $25,000 claim was the only tangible claim to which a vote could be assigned. Nonetheless, when the voting proxies were sent to creditors, it afforded them an opportunity to contest the claim valuation contained within them, (see scheme at § 4.5.1; expl. stmt. at § 4.3); however, Gold Medal did not take advantage of that mechanism. It never returned the voting proxy with supporting documentation for the amount of the Pesticide Claim. Instead, Weddle called Walsh about the $25,000 commutation Class A general proxy and inquired why Gold Medal was not getting to vote the value of the Pesticide Claim. Walsh explained to him that the Pesticide Claim could not be voted without a corresponding case reserve which required the prior filing of a proof of loss. He pointed out, though, that the valuation for voting purposes would not affect the ultimate determination of the Pesticide Claim and that the claims handling procedures would be the same as during the reinsurance relationship. Whereas Gold Medal and General Mills claim that Walsh misled them by that statement, it was truthful. Both Kerr and Brice testified that Hopewell's traditional claims handling procedures were premised on the reinsured submitting a proof of loss and a recommendation by an independent loss adjuster so that a case reserve could be established. That is precisely what other reinsureds had done in the past. The record reflects that Hopewell pointed out to Gold Medal that it could not establish a case reserve without Gold Medal filing a proof of loss first.

Brice at 1249–50. Gold Medal chose not to follow this path.

Gold Medal retorts that Hopewell knew of the Pesticide Claim. That is true, but Hopewell could not assign it a vote without some measure of the claim's would-be liquidated (or estimated) value. The suggestion that Hopewell's actions are lacking in good faith because it breached duties to Gold Medal as its reinsurer is unpersuasive. Whatever duties Hopewell and Gold Medal may have to each other in the insurance context really have nothing to do with a creditor's basic duty to file a claim in order to participate in a scheme of arrangement or, under U.S. law, in a plan of reorganization. As the Second Circuit Court of Appeals explained in *In re Hooker Investments, Inc.*, it is necessary for sound bankruptcy administration that claims be filed, even where important rights such as trial by jury must be compromised by the creditor wishing to participate in the administration of the estate. *First Fidelity Bank, N.A., New Jersey v. Hooker Investments, Inc. (In re Hooker Investments, Inc.)*, 937 F.2d 833, 840 (2d Cir.1991). Gold Medal suggests that it should have been permitted to vote an enormous claim which it refused to file or quantify and that, in addition, it should not have been and is not bound by the scheme. Such a result is wrong, not only under Bermuda law, but under ours as well.

The statutory effect of the scheme binds all creditors, whether they voted in its favor or not. *See* Act at §§ 99(1), (2) and (3); *In re Guardian Assurance Company* [1917]1 Ch. 431, 448–49. Although Gold Medal and General Mills would like to escape this reality by arguing that Gold Medal abstained from voting, I have already found that Gold Medal voted in favor of the scheme. Now, Gold Medal and General Mills seek to collaterally attack the scheme. But this is not the proper forum for a belated and disguised appeal.

---

**32.** Because Gold Medal never submitted a proof of loss so that a case reserve could be established and a voting weight ascertained, I

do not reach the issue of whether Gold Medal should have been allowed to vote in Class B rather than Class A.

*See Gee,* 53 B.R. at 902 (where creditor of defunct Cayman Island reinsurance company filed winding-up petition claiming that reinsurance company was bankrupt, reinsurance company did not oppose petition, did not appeal the order appealing the liquidator, did not seek substitute outside counsel despite its later claim that the Cayman Bar was biased against it and allowed a witness on its behalf to leave the Cayman Islands, and where the reinsurance company opposed the § 304 petition in the United States claiming that it was denied a fair opportunity to defend itself in the Cayman Islands, court held that "[t]his argument [was] tantamount to an attempt by the debtor to appeal the Grand Court's orders, an avenue which, significantly, was never exhausted by the debtor."). Whereas clear and convincing evidence that a fraud was perpetrated on the Bermuda court would support a collateral attack, *see Clarkson Co. v. Shaheen,* 544 F.2d 624, 631 (2d Cir.1976); *Gee,* 53 B.R. at 902, Gold Medal and General Mills have made no such showing.

█ A plan of reorganization, once confirmed, has preclusive effect. *See Maxwell Communication Corporation v. Societe Generale (In re Maxwell Communication Corporation),* 93 F.3d 1036, 1048 (2d Cir.1996) (*citing Sure–Snap Corp. v. State Street Bank & Trust Co.,* 948 F.2d 869, 873 (2d Cir.1991)). Indeed, where a party-in-interest could or should have objected prior to confirmation, he or she is barred from doing so post-confirmation. *See Maxwell,* 93 F.3d at 1046 (*citing First Union Commercial Corp. v. Nelson, Mullins, Riley and Scarborough (In re Varat Enters.),* 81 F.3d 1310, 1316 (4th Cir. 1996)). Thus, the scheme's binding effect is very similar to the effect of confirmation of a plan. As long as the manner in which the scheme acquired statutory effect comports with our notions of procedural fairness, comity should be extended to it. *See Cunard,* 773 F.2d at 457; *Gee,* 53 B.R. at 902. Gold Medal was provided with notice of the scheme's provisions and how they

would affect it as well as several opportunities to object. What it perceives as its predicament was one of its own making.

### b. *Gold Medal's Objection to Classification is Barred*

Gold Medal and General Mills argue that under prevailing English jurisprudence they are not bound by the scheme because it invalidly groups together into one class creditors whose rights are materially different from one another. Specifically, they say, the scheme should not have classified together claims of creditors whose reinsurance contracts were originally governed by the law of jurisdictions other than Bermuda with claims of creditors whose reinsurance contracts were already governed by Bermuda law and therefore suffered no change of law by virtue of the scheme's dispute resolution mechanism.

The principles of classification or class constitution are judicially-crafted in England and Bermuda, the Companies Act 1981 being silent in this regard. In both jurisdictions, a class is "confined to those persons whose rights are not so dissimilar as to make it impossible for them to consult together with a view to their common interest." *Sovereign Life Assurance Company v. Dodd* [1892] 2 Q.B. 573, 583. Both experts agree that a class is improperly constituted where it would allow a majority to oppress a minority because there is lacking a sufficient commonality of interest among the class members for them to be able to decide what is in their collective best interest. Moss at 438; Potts at 1810 (explaining the *Sovereign Life* case). To warrant the creation of a separate class, however, the degree of difference or dissimilarity between creditors' rights must be material. Moss at 1930; Potts at 1843. Where a creditor has been improperly classified, both Moss and Potts also agree that such creditor is not bound by the scheme. Moss at 408–09; *cf.* Potts at 1808, 1813, 1857, 1904 (testifying that if classification is wrong then the scheme

administrators have not complied with § 99 and the scheme does not bind any of the creditors). Thus, if Gold Medal's claim was irregularly classified, it will not be bound under the scheme.

Where the experts' views on classification diverge is the point in time when an objection thereto should be raised. Potts testified that classification could be raised at any time, proper classification being a fundamental prerequisite to the scheme becoming statutorily effective. Potts at 1808, 1813, 1845–46, 1857, 1904. Moss, however, testified that although he could conceive of scenarios where classification could be raised after the scheme was sanctioned, such as where a fraud had been perpetrated, (Moss at 456–57), for the most part, if a creditor had notice of the scheme and its provisions, the time to object to classification was during the scheme process and/or at the sanction hearing, at the latest. Moss at 441. Moss expressed the view that class structure is material only if it prejudices creditors and that, where all creditors consent to a scheme by voting in favor of it, as here, they obviously did not feel themselves prejudiced. Moss at 441.

■ I find Moss' testimony to be the more persuasive. The scheme process offered Gold Medal several opportunities to voice its discontentment concerning the scheme's class structure. Gold Medal was aware of the scheme's provisions yet never spoke up to anyone at Hopewell about classification; Gold Medal did not dispute but, rather, accepted its Class A claim for voting purposes; it voted in favor of the scheme; it did not object at the sanction hearing; it did not appeal the Sanction Order; and it did not seek to have the Bermuda Injunction altered or rescinded. These many opportunities were not lost on Moss, who testified that Gold Medal would be estopped from raising classification at this juncture because 1) Gold Medal had received notice of the scheme; 2) Gold Medal and General Mills had read the documents and forwarded them to experienced counsel to review; 3) Gold Medal never objected (to the valuation on the general proxy or in general); 4) Gold Medal voted in favor of the scheme; and 5) Gold Medal received substantial benefits under the scheme in the form of payment on its $25,000 Class A commutation claim. Moss at 433. The same result would obtain in an American proceeding. So long as a creditor has notice of the confirmation proceedings, that creditor may not relitigate post-confirmation an issue which could have been objected to pre-confirmation. *See Maxwell,* 93 F.3d at 1046; *Sure–Snap,* 948 F.2d at 873; *Varat,* 81 F.3d at 1316; *In re 401 East 89th Street Owners, Inc.,* 223 B.R. 75, 79 (Bankr.S.D.N.Y.1998).

■ Comity evaluates the procedural fairness of the foreign act, judicial or legislative, for which recognition is sought. *See Gee,* 53 B.R. at 902. Implicit, then, in the extension of comity is the acceptance that, once the demands of procedural due process have been met, the court granting comity must accept the finality of those foreign acts, *see Cunard,* 773 F.2d at 457 ("The rationale underlying the granting of comity to a final foreign judgment is that litigation should end after the parties have had an opportunity to present their cases fully and fairly to a court of competent jurisdiction."), and not question or address issues that could have been but were not raised in that foreign proceeding. Gold Medal having failed to establish that any fraud occurred and the scheme proceeding having been procedurally fair, I believe that the statutory effect of the scheme must be respected and that Gold Medal is foreclosed from raising the classification issue in this ancillary proceeding. Were a challenge to classification to lie at this late date, a proposition which is dubious at best, it ought lie in Bermuda, not here, inasmuch as there has been neither fraud nor lack of due process visited upon Gold Medal. *See Gee,* 53 B.R. at 902.

■ Even were the classification improper in Hopewell's scheme, according

comity to the sanctioned scheme, despite that alleged defect, is not repugnant to our notions of justice nor offensive to the citizens of this country because, under our own jurisprudence, a confirmed plan of reorganization is entitled to *res judicata* effect even if it was improperly confirmed; in other words, in the absence of fraud or want of jurisdiction by the confirming court, the order of confirmation is immune from collateral attack and may only be challenged by direct appeal. *See Celotex Corp. v. Edwards,* 514 U.S. 300, 313, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995); *Stoll v. Gottlieb,* 305 U.S. 165, 170, 59 S.Ct. 134, 83 L.Ed. 104 (1938); *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.),* 898 F.2d 1544, 1553 (11th Cir.1990) ("[W]hen the objection is based on an argument that the plan misclassified the objectionable claim, the objection must be made prior to confirmation of the plan.").

In any event, Gold Medal's and General Mills' reliance on *Sovereign Life Assurance Company v. Dodd,* the seminal English Court of Appeals case in the area of classification, seems misplaced. In that case, Dodd, a creditor whose life insurance policy had matured, was grouped together with creditors whose life insurance policies had not matured. It is not clear whether or not he received notice of the meeting of creditors: "[t]he persons who had notice of the meeting were policy-holders—that is to say, policy-holders whose policies had to be dealt with. But [Dodd] was not a policy holder at all; his policies had been fulfilled." *Sovereign Life,* 2 Q.B. at 580. Furthering the mystery surrounding whether Dodd actually knew about the proceedings, the court recited that Dodd did not assent to the scheme. In any event, the court held that Dodd could not be classified with policy-holders because he was not one; "he was a creditor for a full amount of the policies … he had a vested cause of action, the policy-holders had none; and it is obvious that he could not consider the matter with the same mind and from the same point of view as the policy-holders who were summoned to the meeting." *Id.* Hopewell's case is distinguishable for two reasons, because Gold Medal had notice of the scheme and because it voted in favor of that scheme. If proper classification presupposes that creditors can meet together and discuss their interests collectively, wouldn't an unfair class structure equally presuppose a majority oppressing a minority, which would be manifested by the existence of votes against the scheme? But acceptance of Hopewell's scheme was unanimous and no one objected at the sanction hearing.

3. Arbitration of Claims in Bermuda is Neither Prejudicial Nor Inconvenient

Given the clarity of the arbitration provisions in the scheme and the references to them in the explanatory statement, Gold Medal and General Mills refrain from arguing that they were hoodwinked. Rather, they say, they are being prejudiced and inconvenienced by 1) Gold Medal's having to arbitrate its reinsurance claim against Hopewell (based on the Pesticide Incident) in Bermuda and in accordance with Bermuda law instead of in Minnesota and in accordance with Minnesota law (which was provided for in Gold Medal's reinsurance contract with Hopewell) in contravention, they claim, of the sanctity and inviolability of their previously agreed-upon arbitration rights under the Federal Arbitration Act (the "FAA"); and 2) Gold Medal's effectively having to relitigate through the scheme's arbitration provisions the issues covered by the Baseball Arbitration.

Treating with the second argument first, the issues between Gold Medal and General Mills, on the one hand, are different from those between Gold Medal and Hopewell, on the other. Whereas Gold Medal's liability to General Mills is at issue with respect to the Pesticide Incident, as between Gold Medal and Hopewell there is a *bona fide* issue with respect to whether Hopewell is bound to any settlement Gold Medal might make with General Mills.

Moreover, the Baseball Arbitration does not require the arbitration panel to issue a written opinion explaining the legal basis for its decision, precluding the making of any record of which issues were actually litigated and how they were decided.

As to the first argument, the FAA provides that a written contractual provision to arbitrate "shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (1999). The Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") was implemented in the United States through chapter 2 of the FAA. See 9 U.S.C. § 201 et seq. (1999). The Convention requires courts to enforce written arbitration clauses in international commercial contracts as the mechanism to resolve international commercial disputes arising out of them, see Convention, art. II ¶ 2, except that an arbitration clause will not be recognized if it is "null and void, inoperative or incapable of being performed." Convention art. II ¶ 3.

Cunard Steamship Company Limited v. Salen Reefer Services, AB, is instructive insofar as resolution of the FAA argument is concerned. Salen was a Swedish business undergoing bankruptcy proceedings in Sweden. Cunard and Salen had entered into a contract of charter which provided for arbitration in London, but Cunard commenced an action, while the Swedish bankruptcy proceedings were already pending, in the Southern District of New York to obtain an order of attachment against certain assets held by Salen's garnishee pursuant to what was then § 8 of the FAA. Salen moved to dissolve the attachment, relief which the district court granted, reasoning that comity should be extended to the Swedish bankruptcy proceedings and their automatic stay. On appeal, Cunard advanced the same argument that Gold Medal and General Mills have made here, that extending comity to the foreign proceeding violates U.S. public policy favoring the enforcement of arbitration rights. See Cunard, 773 F.2d at 454.

While the Second Circuit recognized the strong policy favoring arbitration, as enunciated by the Supreme Court in Scherk v. Alberto–Culver Co., 417 U.S. 506, 516–20, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (and now, its progeny), it held that "the public interest in the fair and efficient distribution of assets in a bankruptcy is also significant." Cunard, 773 F.2d at 459 (noting that arbitration clauses are subject to the automatic stay provisions of § 362). Because Cunard was not a secured, but an unsecured, creditor, the court found the attachment to be in reality an attempt by Salen to secure any arbitral award it might receive. See id. Holding that the Swedish bankruptcy proceedings were entitled to comity, the court instructed that allowing Cunard to effectively receive a preference by way of the attachment cut against the grain of the Bankruptcy Code whose guiding premise is "the equality of distribution of assets among creditors." Id. The panel noted Cunard's failure to demonstrate that according comity to the Swedish proceeding would in any way infringe U.S. public policy and explained that, in fact, public policy would be best served by recognizing the Swedish proceedings, thereby "facilitat[ing] the orderly and systematic distribution of the assets of Salen." Id.

Although Gold Medal is not in the same position procedurally as Cunard because Cunard exercised its rights under the FAA whereas Gold Medal only wishes to do so, the same rights to arbitrate are at stake. Gold Medal is also an unsecured creditor seeking to gain a preference by going outside the scheme and attaching Hopewell's American assets to secure any arbitral award Gold Medal may receive against Hopewell, thereby satisfying its claim before and in derogation of the rights of all other scheme creditors. While it is true that § 99 of the Companies Act 1981 does not contain an automatic stay, the scheme itself prohibits creditors

from commencing any actions or proceedings other than those called for under its dispute resolution provisions. Moss at 478. So important is this stay that the Bermuda court buttressed it with a creditor-specific injunction when presented with evidence that Gold Medal was attempting to circumvent the scheme. Just as Cunard's actions violated the stay imposed by the Swedish bankruptcy proceedings, Gold Medal's actions threaten to violate the scheme and interfere with the orderly collection, administration and distribution of estate assets to the grave detriment of other creditors. In reaching its conclusion that Cunard was bound by those stay provisions, the *Cunard* court weighed the public policy interests in upholding arbitration agreements against those of recognizing and aiding a foreign bankruptcy and concluded that the arbitration policy must yield. *See id.*

■ Comity should not be extended if U.S. citizens will be prejudiced by the foreign proceeding or if by extending comity to that foreign proceeding, American creditors will be forced to participate in a proceeding where their claims "will be treated in some manner inimical to this country's policy of equality." *Cunard*, 773 F.2d at 459 (*citing Banque de Financement, S.A. v. First National Bank of Boston*, 568 F.2d 911, 921 (2d Cir.1977)). Once Gold Medal's Pesticide Claim is liquidated, Hopewell intends pursuant to the scheme to pay creditors in full with interest; I fail to see how Gold Medal could thereby be prejudiced. Additionally, it is not as if the scheme either imposed arbitration as a new method for resolving claims or took arbitration away and replaced it with a wholly different dispute resolution mechanism. If Gold Medal was willing to submit to arbitration in Minnesota, the scheme does not unjustly treat Gold Medal by requiring it to submit to arbitration in Bermuda. *See Cunard*, 773 F.2d at 458–59 (creditors of an insolvent foreign corporation may be required to assert their claims against the foreign bankrupt

in the foreign proceeding). Foreign creditors seeking a distribution in an American bankruptcy case are routinely required to litigate their claims here. *See Brierley*, 145 B.R. at 163 (*citing Canada Southern Railway v. Gebhard*, 109 U.S. 527, 539, 3 S.Ct. 363, 27 L.Ed. 1020 (1883)). Even though the parties' contract called for application of Minnesota law, Gold Medal voted in favor of the scheme, which altered the applicable law. Forcing Gold Medal to arbitrate under Bermuda law is not anathema where the arbitration is being conducted in accordance with the International Conciliation and Arbitration Act of 1993, which has adopted the model law promulgated by UNCITRAL (which many individual states in the United States have adopted and whose procedural rules are often used to supplement federal arbitrations); Bermuda is a sister common law jurisdiction, *see Clarkson*, 544 F.2d at 630; and Gold Medal consented to this change in the governing law.

Moreover, had Gold Medal abstained, I would feel no differently in light of the requisite majority approval of the scheme. Bankruptcy sometimes causes changes in contractual rights necessary to benefit the estate as a whole. Thus, for example, under U.S. law, clauses which purport to terminate contracts upon the happenstance of bankruptcy are invalidated; use clauses in leases may be abrogated except if the leasehold is in a shopping center; and damages from the breach of an employment contract are capped as are as damages from the breach of a lease. *See* 11 U.S.C. §§ 365(b)(2); 502(b)(6); 502(b)(7) (1999); *In re U.L. Radio Corp.*, 19 B.R. 537, 543 (Bankr.S.D.N.Y.1982). Hopewell advanced good and sufficient reasons why arbitration in one jurisdiction under one country's law would aid in carrying out its scheme. I cannot say that the Bermuda court's acceptance of these reasons (as evidenced by its issuance of the injunction against Gold Medal as well as its sanctioning of the uncontested scheme) was either capricious or violative of some fundamental U.S. public policy. *See Anderson v. Dal-*

*kon Shield Claimants Trust (In re A.H. Robins Company, Incorporated)*, 42 F.3d 870, 874–75 (4th Cir.1994) (approving change of governing law to one uniform law and statute of limitations to one uniform prescriptive period for claims to be arbitrated under a claims resolution process initiated pursuant to the confirmed plan).

Much like a plan of reorganization, a scheme of arrangement is an agreement between a company and its creditors. *See Guardian*, 1 Ch. at 449–50; *Kempe v. Ambassador Ins. Co.*, [1998] 1 BCLC 234, 238. Its purpose is to conduct the run-off in a cheaper, quicker and more efficient way by altering and modifying pre-existing contractual rights. Moss at 429–30, 464. Once the scheme is approved by at least three-quarters of the creditors present and voting in each class, sanctioned by the court and filed with the Registrar, it acquires the force and effect of a statute, binding all creditors. *See Kempe*, 1 BCLC at 238; Moss at 464. Thus, where a scheme modifies pre-existing contractual rights, such as this one did by giving notice that, unless otherwise agreed, Bermuda law was going to apply, the rights as set forth in the statutorily effective scheme supersede any pre-existing rights held by the creditors bound under the scheme. Gold Medal had notice of the proposed modifications and consented to them. It agreed to replace arbitration in Minnesota with arbitration in Bermuda and is now bound by the arbitration terms contained in the scheme. *See A.H. Robins*, 42 F.3d at 875 (approving arbitration provisions for resolving claims pursuant to confirmed plan where substantive law was declared to be that of Virginia and statute of limitations was fixed at three years, the court explaining: "We are not concerned except *in extremis* with whether or not there exist standards more favorable to the in-

tervenors or more favorable to the Trust [created under the plan] in the substantive law of other states than Virginia, or periods of limitation more favorable to the Trust or to the intervenors than those promulgated in Rule I [of the arbitration rules] mentioned above. The question is simply whether the Trustees have abused their discretion by adopting the rules with respect to substantive law and period of limitations we have mentioned. No such abuse has been shown, and we do not think that either the substantive law of Virginia or the rule as to a period of limitations imposed by Rule I is an extreme case at all, much less so extreme so as to warrant a finding that its imposition would constitute an abuse of discretion."). The statutory effect of the scheme is no different from the effect of a confirmed chapter 11 plan which may modify prepetition claims and rights and bind all creditors to those new terms in the confirmed plan. *See* 11 U.S.C. § 1141(a) (1999); *see Varat*, 81 F.3d at 1317 ("Under the Bankruptcy Code, a confirmed plan of reorganization acts like a contract that is binding on all of the parties, debtor and creditors alike.").

■ As *Cunard* demonstrates, the admittedly strong policy favoring arbitration is not as sacrosanct as Gold Medal and General Mills urge. Indeed, in the context of state law insurance insolvencies, an area germane to the one in which we find ourselves, the arbitration policy yields to the administration of the liquidating insurer. Courts in the Second Circuit have been loathe to allow federal actions to interfere with the state's strong interest in regulating insolvent insurance companies pursuant to the mandate of the McCarran–Ferguson Act.[33] *See Law Enforcement Insurance Company, Ltd. v. Corcoran*, 807 F.2d 38, 44 (2d Cir.1986) (affirming district court's abstention because the

---

**33.** The McCarran–Ferguson Act provides in pertinent part:

No Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regu-

lating the business of insurance ... unless such Act specifically relates to the business of insurance.

15 U.S.C. § 1012(b) (1997).

structure of New York's system serves the state's strong interest in centralizing claims against an insolvent insurer into a single forum where they can be efficiently and consistently disposed of, a method which would only be impaired by federal court intervention); *Levy v. Lewis*, 635 F.2d 960, 963 (2d Cir.1980) (regulation of insolvent insurance companies is a matter of great public concern because liquidation proceedings involve "the adjustment of thousands of claims against the insurer by policyholders and those who claim under them" as well as other various claims). The McCarran–Ferguson Act establishes an "express federal policy of non-interference in insurance matters." *Id.* at 963–64.

In *Corcoran v. Ardra Insurance Company, Ltd.*, the Superintendent of Insurance originally sued Ardra Insurance Company and two of its officers for the recovery of reinsurance proceeds. The defendant, Ardra, a Bermuda reinsurance company, sought to remove the action to federal court and compel the Superintendent of Insurance, who eventually became the liquidator of Nassau Insurance Company, a New York corporation, to arbitrate Ardra's liability to Nassau in accordance with the arbitration provisions in their underlying reinsurance contract and under the terms of the FAA and the Convention. *See Corcoran v. Ardra Insurance Company, Ltd.*, 77 N.Y.2d 225, 228–29, 566 N.Y.S.2d 575, 567 N.E.2d 969 (1990). The New York Court of Appeals held that a state's prerogative under the McCarran–Ferguson Act to regulate the business of insurance was paramount and that because the FAA did not regulate the business of insurance and arbitration was not available to the Superintendent as a liquidator under the Insurance Law, arbitration was "incapable of being performed" under the exceptions to the Convention. *Id.* at 232–33, 566 N.Y.S.2d 575, 567 N.E.2d 969 (referring to the Convention, art. II ¶ 3). In so holding, the Court explained that the exceptions to the Convention are "properly construed to effect New York's strong public policy concerns by maintaining [the]

Supreme Court's exclusive jurisdiction over liquidation proceedings." *Id.* at 233, 566 N.Y.S.2d 575, 567 N.E.2d 969; *see also Stephens v. American International Ins. Co.*, 66 F.3d 41, 45 (2d Cir.1995) (Kentucky Liquidation Act's anti-arbitration provision was not pre-empted by the FAA); *Washburn v. Corcoran*, 643 F.Supp. 554, 557 (S.D.N.Y.1986) (holding that the FAA must yield to the McCarran–Ferguson Act and Superintendent of Insurance of Illinois could not be compelled to arbitrate reinsurance dispute).

Hopewell's scheme is similar both in its end and means to a state's regulation of an insolvent insurance company. The scheme's goals are to manage, administer and control hundreds of claims submitted by its reinsureds. The scheme has chosen and implemented arbitration in Bermuda as the exclusive mechanism by which to estimate or fix these claims. The public policy reasons of centralization of the claims adjudication process as approved in the main proceeding and, conversely, the avoidance of piecemeal litigation in secondary fora, *see Corcoran*, 807 F.2d at 41, which support the primacy of a state's regulation of insurance insolvencies over a party's contracted-for arbitration rights, also suggest that Hopewell's claims resolution provisions should be respected.

The real thorn in Gold Medal's and General Mills' sides is the "follow the settlements" issue. When the scheme was drafted, proposed, voted on and sanctioned, English and Bermuda law paralleled American insurance law such that arbitrating under Bermuda law or Minnesota law probably made no difference with respect to Gold Medal's chances of enforcing any settlement of the Pesticide Claim with General Mills against Hopewell. With the seasons, the tides change. After the scheme was sanctioned, the House of Lords reversed the Court of Appeals, issuing an opinion which indicated that a clause arguably similar to that contained in Gold Medal's reinsurance contract with

Hopewell was not a "follow the settlements" clause. *See Hill v. Mercantile and General Reinsurance Co. Plc.,* [1995] LRLR 160 (Court of Appeals); *Hill v. Mercantile and General Reinsurance Co. Plc.,* [1996] 3 All ER 865, [1996] 1 WLR 1239, [1996] LRLR 341 (House of Lords). However, this was not Hopewell's doing and Hopewell certainly was not a prognosticator of this change in the law, expediting the scheme process in order to pull the wool over Gold Medal's eyes, as Gold Medal and General Mills seem to imply. Gold Medal evaluated the landscape when votes were solicited, voted in favor of and did not challenge the scheme, acts which it may now regret. However, regret is no substitute for prejudice, and prejudice there is none.

### 4. Comity

■■■■ The first four factors which we have just discussed are specific markers or guideposts; the foreign proceeding's compliance or non-compliance with them enters the court's decision whether to grant the ancillary petition. *See Culmer,* 25 B.R. at 627–28 (court should apply factors to specific circumstances of case in order to arrive at a fair result). The fifth factor, comity, is a more wide-ranging concept; it is especially important in the international insolvency context because "deference to foreign insolvency proceedings will, in many cases, facilitate 'equitable, orderly, and systematic' distribution of the debtor's assets," *Maxwell,* 93 F.3d at 1048 (*quoting Cunard,* 773 F.2d at 458 and *citing Victrix,* 825 F.2d at 713). To this end, Congress explicitly recognized comity as an important principle in transnational insolvency situations when it revised the bankruptcy laws. *See Maxwell,* 93 F.3d at 1048. Comity, however, is much more than a discrete element or factor to be considered as part of a larger analysis; it is a pervasive principle of international law which reflects that courts of one nation ought to respect the authority of another nation to legislate over, command and adjudicate issues concerning its own the citi-

zens. *See Hilton,* 159 U.S. at 163–64, 16 S.Ct. 139.

■■■■ Comity should therefore be accorded to orders and decisions of a foreign court as well as to foreign statutes as long as "it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated." *Gee,* 53 B.R. at 901; *see Hilton,* 159 U.S. at 202–03, 16 S.Ct. 139; *Cunard,* 773 F.2d at 457; *Haarhuis,* 177 F.3d at 1013 (*citing* 3 COLLIER BANKRUPTCY MANUAL ¶ 304.08(5)(b)) ("Comity is a doctrine that encourages deference to foreign laws and judgments if macro systemic concepts, such as due process and impartiality, are present in the foreign proceeding."); *Rubin,* 160 B.R. at 283 ("[s]o long as the laws of the foreign jurisdiction are not repugnant to our own"); *Brierley,* 145 B.R. at 163. And, when the foreign proceeding is in a "sister common law jurisdiction with procedures akin to our own," *Clarkson,* 544 F.2d at 630, comity should be extended with less hesitation, there being fewer concerns over the procedural safeguards employed in those foreign proceedings. *See Cornfeld v. Investors Overseas Services, Ltd.,* 471 F.Supp. 1255, 1259 (S.D.N.Y.), *aff'd* 614 F.2d 1286 (2d Cir. 1979); *Brierley,* 145 B.R. at 163.

■■■■ One of the primary functions of an ancillary proceeding is to aid the foreign representative in the administration of the foreign estate. *See Simon,* 153 F.3d at 998; *Manning,* 236 B.R. at 21; *Bird,* 229 B.R. at 94; *Brierley,* 145 B.R. at 158. In furtherance of that objective, unless there is some *sui generis* aspect of U.S. law which is implicated, *see Banco Nacional de Obras y Servicios Publicos, S.N.C.,* 91 B.R. 661 (Bankr.S.D.N.Y.1988), courts defer the liquidation and resolution of claims to the main proceeding because the home court is in the best position to assess and liquidate claims in order to conserve estate resources and maximize the assets available for distribution. *See*

*Bird,* 229 B.R. at 94. The scheme's arbitration provisions were intended to concentrate the claims resolution process in one forum and under one law in order to streamline and economically perform that activity and to enhance uniformity of result. To allow one creditor, Gold Medal, to deviate from that established claims procedure and attach assets in the United States would undermine the efficacy of the scheme and interfere with the foreign representative's efforts to collect assets and administer them for the collective good of all creditors.

There is a great possibility that if Gold Medal's efforts are not curtailed, other creditors will follow in Gold Medal's footsteps. Not only would such actions hinder Hopewell's efforts to collect assets, especially the Accounts Receivable from the retrocessionaires, and distribute them in accordance with the scheme, but actions to attach the Accounts Receivable might impel the retrocessionaires to stop paying Hopewell altogether. Were I to countenance Gold Medal's intended activities, I would not be helping the foreign proceeding in its endeavor to run-off Hopewell but, rather, would be helping Gold Medal to give itself a preference by allowing it to pay itself before the balance of creditors. If Gold Medal gets paid first and other creditors, such as Three Rivers, follow in its footsteps, or if the retrocessionaires stop paying Hopewell, funding for the scheme will soon be depleted, harming all of Hopewell's other creditors who, along with Gold Medal, unanimously voted in favor of the scheme because they believed it would benefit them. As I have earlier explained, not only is there nothing inequitable about enforcing the scheme's provisions and requiring Gold Medal to arbitrate in Bermuda, there is a crying need to grant comity to the scheme.

For exactly the same reasons, the Bermuda Injunction, although granted *ex parte,* is also entitled to comity. Gold Medal was given notice of entry of the order which explicitly afforded Gold Medal the opportunity to appear before the Bermuda court within seven days and contest or seek to modify the Injunction. This type of procedure, albeit atypical, is not foreign to our judicial framework. The clearest example is found in Rule 65(b) of the Federal Rules of Civil Procedure which permits the *ex parte* issuance of a temporary restraining order

> only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, in any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.... On 2 days' notice to the party who obtained the temporary restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.

FED.R.CIV.P. 65(b); *see also Connecticut v. Doehr,* 501 U.S. 1, 16–18, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991) (due process is satisfied where there is a pre-attachment hearing requiring some showing of exigent circumstances requiring *ex parte* relief and the opportunity for the party whose property has been attached to contest the attachment and be made whole if he or she was damaged thereby and the attachment turns out to have been unwarranted). An attachment may also issue *ex parte* under federal civil procedure pursuant to Federal Rule of Civil Procedure 64, which incorporates state law. *See Bank Leumi Trust Company of New York v. Istim, Inc.,* 892 F.Supp. 478, 481 (S.D.N.Y.1995); FED. R.CIV.P. 64; N.Y.CIV.L.PRAC.R. §§ 6212(a) and 6201(3). Once the *ex parte* attachment order is issued, the movant must give

notice to the party whose property has been attached of the attachment and of a hearing to confirm the attachment, where the party who obtained the attachment must make another specified showing to the court. *See* N.Y.CIV.L.PRAC.R. §§ 6211(b) and 6223(b); *Bank Leumi*, 892 F.Supp. at 481–82.

■ The Bermuda court held an *ex parte* hearing where Hopewell established that, without an injunction, Gold Medal was going to violate the scheme and endanger its success, thereby harming the entire scheme creditor body. Notice of the Bermuda Injunction was served on Gold Medal which provided for a "post-injunction" hearing where Gold Medal could participate and contest the merits underlying the issuance of the Bermuda Injunction. Gold Medal chose not to respond. The injunction recited that Hopewell had agreed to abide by any order the court might make as to damages suffered by Gold Medal as a result of the injunction which damages the court felt Hopewell ought to pay. Comity does not require that the foreign law be a mirror image of our own. *See Gee*, 53 B.R. at 904. It is enough that procedural due process requirements were met in this instance. *See id.* at 902. Gold Medal's choice not to act cannot be transformed into a deprivation of due process. It is hardly surprising that the Bermuda court was moved to protect the scheme which the creditors had approved and which it had sanctioned. In the United States, it is typical for the order confirming a plan to contain an injunction preventing the creditors from thwarting the plan and seeking to enforce their discharged claims. In addition, § 1142 of the Bankruptcy Code specifically permits the bankruptcy judge to issue an order mandatorily enjoining parties in interest to perform any acts necessary for the consummation of the confirmed plan. Hopewell was not conjuring up hobgoblins; Gold Medal had candidly admitted its intention to seek to impose liability against Hopewell in the United States, in contravention of the claims resolution provisions of the scheme, and to follow up any victory with an assault on Hopewell's U.S. assets. Just as the sanctioned scheme is entitled to comity, so, too, and for the same reasons, is the Bermuda Injunction.

## V.

Having decided that the board of directors of Hopewell is a "foreign representative," that Hopewell's scheme of arrangement is a "foreign proceeding" and that the § 304(c) factors have been met, I am authorized pursuant to § 304(b) to enjoin commencement or continuation of any action or proceeding against Hopewell with respect to property involved in the foreign proceeding or against the property itself, and to order other appropriate relief. *See* 11 U.S.C. §§ 304(b)(1) and (b)(3); *Brierley*, 145 B.R. at 168.

■ After eight days of trial on the merits, I have determined that severe harm in the form of disruption to the orderly determination of claims and the fair distribution of assets in a single forum will befall Hopewell's estate if Gold Medal as well as all other scheme creditors are not permanently enjoined from commencing or continuing any actions or proceedings against Hopewell or its property in the United States which would be in violation of the scheme. *Brierley*, 145 B.R. at 168. Such relief, in the shape of an extension of the Bermuda Injunction against Gold Medal as well as a nationwide injunction affecting all scheme creditors including Gold Medal, is the best way to assure an economical and expeditious administration of Hopewell's estate. *See Brierley*, 145 B.R. at 168–69 (granting permanent nationwide injunction); *Saleh*, 175 B.R. at 426 (extending nationwide preliminary injunction).

Accordingly, Hopewell's petition for ancillary relief pursuant to §§ 304(b)(1) and (3) of the Bankruptcy Code and its request for a permanent injunction thereunder is

GRANTED. Hopewell is directed to settle an order consistent with this opinion.